## ORR v. QUIMBY.

*U. S. coast survey—Eminent domain—Payment—Tender—Public use—Statute—Constitutional law.*

It was not the intention of the legislature which enacted the General Statutes, that the assessment of damages, and the tender provided for in ch. 132, should precede the entry upon and injury to lands therein authorized.

A state has constitutional authority to condemn private property for a public use by the United States.

Property taken for the use of the United States coast survey is taken for a public use.

Chapter 132 of the General Statutes is not unconstitutional, because it does not require an assessment of damages, and payment or tender of the sum assessed, before the entry upon and injury to lands therein authorized, nor provide for a definite and certain fund to secure the payment of compensation. Doe, J., dissenting.

A party injured, under the authority of ch. 132 of the General Statutes, is not entitled to commence an action of tort and maintain it, until an assessment of his damages shall have been made under the statute, and the sum assessed paid or tendered.

An agent of the United States, entering upon and doing injury to land, in the service of the coast survey, under the authority of ch. 132 of the General Statutes, will be liable to an action of tort, unless such entry and injury were reasonably necessary for the purposes of the coast survey.

TRESPASS, by Samuel Orr against Elihu T. Quimby, for breaking and entering the plaintiff's close, in Goffstown, on January 1, 1869, and on other days between that time and the date of the plaintiff's writ, which was July 7, 1873, and cutting down, carrying away, and converting to his own use 710 trees and 195 cords of wood. The defendant pleaded the general issue, together with a special plea setting forth that before and during all the time of said supposed entering, cutting, carrying away, and converting as aforesaid, the defendant was employed by the United States of America, under and by virtue and authority of an act of congress of the United States aforesaid, entitled "An act to provide for surveying the coast of the United States," approved February 10, 1807, and under and by virtue of the several acts of congress of the said United States, supplementary thereto, for the purpose of making a coast survey of the coast of the said United States; and being then and there so employed as aforesaid, the defendant entered the plaintiff's close for the purpose of exploring, surveying, and triangulating the said coast, and for the purpose of levelling the same, and doing any and all other acts necessary to effect the objects of the said several acts of congress, and then and there cut down said trees and wood, and committed the said supposed trespasses in the plaintiff's said writ mentioned, to effect the objects of said several acts of congress, then and there doing no unnecessary damages thereby, all which, the defendant says, he might then and there lawfully and properly do. To this plea the plaintiff demurred. The plaintiff claimed, at the trial term, that the defendant could not enter without first tendering compensation; and that if ch. 132 of the Gen. Stats. undertakes to authorize an entry and cutting of trees for the purpose therein named, without compensation previously tendered, the statute is, to that extent, unconstitutional. The questions raised by the demurrer and by the plaintiff's claim were reserved.

*Morrison, Stanley, & Hiland*, for the plaintiff.

*Rolfe*, U. S. District Attorney, for the defendant.

HIBBARD, J. The defence in this case is based on the following provisions of chapter 132 of our General Statutes:

"SECTION 1. Any person employed under an act of the congress of the United States, passed the tenth day of February, one thousand eight hundred and seven, and the supplements thereto, may enter upon lands within this state for the purpose of exploring, surveying, triangulating, levelling, or doing any other act which may be necessary to effect the objects of said acts, and may erect any works, buildings, stations, or appendages requisite for that purpose, doing no unnecessary damage thereby.

"SEC. 2. If the parties interested cannot agree upon the amount to be paid for the damages caused by doing any of the acts aforesaid, either of them may petition the supreme court for the county in which the

land entered upon is situate, for an assessment of said damages, who shall refer the same to the county commissioners for such county, who shall hear the parties and make report, as in the case of assessing damages for land taken for highways; and other like proceedings shall be had thereon, as in such cases.

"Sec. 3. The person so entering upon land as aforesaid may tender to the party injured sufficient amends therefor; and if the damages finally assessed do not exceed the amount so tendered, the person so entering shall recover his costs."

I. The position was taken by the plaintiff's counsel that this statute by its terms requires the assessment of damages for which it provides, and payment or tender of the sum assessed, to precede the taking of property under it, and that the defendant's plea is defective, because it does not allege a compliance with this requirement of the statute. It is clear that this position cannot be sustained. The second section provides that " if the parties interested cannot agree upon the amount to be paid for the damages caused "—not the damages *to be* caused— " by doing any of the acts aforesaid, either of them may petition the supreme court." The third section provides that " the person so entering upon lands as aforesaid may tender to the party injured "— not to the party *to be* injured—" sufficient amends therefor." This plainly indicates that the intention of the legislature was that the taking should precede both the assessment and the tender. Nothing less than the most unequivocal language could justify us in holding that it ever could have been intended to provide that an assessment of damages to be caused by " exploring, surveying, triangulating, levelling, or doing any other act which may be necessary " should be made,—or that a party whose land was about to be entered upon for such purposes should be compelled to decide, at the risk of subjecting himself to costs, whether to accept the damages tendered to him,—at a time when it might and probably must be beyond the reach of any human power to ascertain what damages were to be done.

II. In the argument of this case, the power of a state to condemn property within its limits for the use of the United States was not disputed. Only four reported cases in which that question has ever arisen have fallen under our observation. In *Reddall* v. *Bryan*, 14 Md. 444, *Gilmer* v. *Lime Point*, 18 Cal. 229, and *Burt* v. *Merchants' Insurance Company*, 106 Mass. 356, acts of the legislatures of Maryland, California, and Massachusetts, providing for the appropriation of lands for necessary uses of the general government, were severally sustained. In *Trombley* v. *Humphrey*, 23 Mich. 471, a similar act of the legislature of Michigan was held invalid. The weight of authority, therefore, is greatly in favor of the existence of such a power in the states, and, without having given to the subject so full a consideration as we might have done had the eminent counsel for the plaintiff not tacitly conceded it, we are of the opinion that the power does exist in the states. Perhaps it also exists in the United States—we are not prepared to say that it does not—but so far as we can discover it has never been

exercised in a single instance; and we think it would be an unfortunate circumstance, if, for the want of friendly legislation in the states, or by reason of judicial decisions against the validity of such legislation, the United States should be compelled to exercise (or attempt to exercise), for national purposes, the right of eminent domain in the states, without the intervention of state authority.

III. But it was contended, on the part of the plaintiff, that the statute is unconstitutional, because the purpose for which it provides—that the property may be taken—is not a public use. That the reverse of this is true is very plain. A safe highway upon the ocean is as much a public necessity as a safe highway upon the land; and it is a matter of universal knowledge, that while the mariner traverses the high seas in comparative safety, he encounters perils on every hand as he approaches the shore. It is impossible to hold, that " to cause a survey to be taken of the coasts of the United States," as is authorized by the acts of congress hereinafter cited, " in which shall be designated the islands and shoals, with the roads or places of anchorage, within twenty leagues of any part of the shores of the United States, and also the respective courses and distances between the principal capes or headlands," and " an accurate chart of every part of the coasts within the extent aforesaid," is not in every sense a public enterprise. It is not merely those whose lives and property are at the mercy of the winds and the waves, but the people of the whole country that have an interest in whatever diminishes the hazards of navigation, and renders commerce, the prolific source of national wealth and prosperity, more secure. All the great maritime nations of the world have made liberal expenditures for the promotion of their coast surveys: the government of the United States has expended from half to three fourths of a million dollars per annum to this object during many years past. The expediency of expending these large sums, or, in fact, any sums, in this way, is, however, a question not for us but for congress to decide, but that whatever sums ought to be devoted to this purpose may properly be appropriated by the general government admits of no doubt.

IV. It was also contended, on behalf of the plaintiff, that the statute, if held not to require the assessment and payment or tender to precede the taking, is unconstitutional, because it does not so require nor provide for a fixed and definite fund to secure the payment of the sum which may be assessed. No other ground of objection to the provision respecting compensation having been suggested, we may assume that the remedy provided for is an appropriate one in other respects. It may be remarked that the tender referred to in the third section of the statute relates only to the question of costs, and can have no effect on the right of a land-owner to maintain trespass, or of either party to petition for an assessment of damages. That section, therefore, has no bearing on the constitutional question just stated.

In *Ash* v. *Cummings*, 50 N. H. 591, this subject was carefully considered, and the decision was, that when an individual or a private cor-

poration is authorized by law to take private property for public uses,
it is indispensable that the law should not only provide for an assess-
ment of the damages, but should secure the appropriation of a definite
and certain fund out of which such damages shall be paid; but, in the
opinion of the court (p. 621), Judge SARGENT states, that "in cases
where the state or a county or a town is to be made liable for the dam-
ages which an individual may suffer by having his property taken for the
public use, it is not so important that the compensation should be paid or
secured in advance, provided the law provides a certain and expedi-
tious way of ascertaining and recovering it, because there the presump-
tion and the fact are that these municipalities are always responsible."
"The decisions upon this point assume that when the state has pro-
vided a remedy, by resort to which the party can have his compensation
assessed, adequate means are afforded for its satisfaction, since the
property of the municipality or of the state is a fund to which he can
resort without risk of loss." Cool. Const. Lim., 3d ed., 561. "A dis-
tinction is found in the books, which seems to have been recognized
as settled, between property taken directly by the state, or a municipal
corporation by state authority, and cases where it is taken by a private
corporation    *    *.  If taken directly by the state, it is not essential to
the validity of the law that it should provide for making compensation
before the actual appropriation: it is sufficient if provision is made in
the law by which the party can obtain compensation, and a proper
tribunal is provided for determining it." Potter's Dwarr. on Stats.
391.

In some authorities it has been laid down, that, even in the case of a
state or municipality, where the compensation does not precede the tak-
ing, an adequate fund must be set apart as security for its payment;
but if we adopt this view, we at once ignore the existence of any such
distinction as has been generally recognized between an individual or
private corporation, and a state or municipality. But this distinction
seems to present more a question of fact than of law. Experience has
shown that states, counties, and towns have sometimes repudiated their
most sacred obligations; but we have no knowledge that New Hamp-
shire, or any county or town within its limits, has ever done so. In a
state in which it cannot with truth be said that "these municipalities
are always responsible," there might be as much necessity that they
should provide a certain and adequate fund for security, as that indi-
viduals and private corporations should do so here.

By the original act of congress relating to the coast survey, approved
February 10, 1807, 2 Stats. at Large 413, which is referred to in our
General Statutes, ch. 132, sec. 1, the president of the United States is
"authorized and requested to cause a survey to be taken of the coasts
of the United States, in which shall be designated the islands and
shoals, with the roads or places of anchorage, within twenty leagues of
any part of the shores of the United States, and also the respective
courses and distances between the principal capes or headlands,
together with such other matters as he may deem proper for completing

an accurate chart of every part of the coasts within the state afore-said." By a supplementary act, approved July 10, 1832, 4 Stats. at Large 571, being one of the "supplements" referred to in the General Stats., ch. 132, sec. 1, the president is "authorized, in and about the execution of the said act, to   *   *   employ all persons in the land or naval service of the United States, and such astronomers and other persons as he shall deem proper." By other "supplements" contained in annual appropriation bills, the act of February 10, 1807, was continued in force a considerable portion of the time previous to 1832, and has been continued in force from year to year ever since.

To support the defendant's plea, it must therefore be shown, that in committing the supposed trespass of which the plaintiff complains, he was engaged in the execution of the act of February 10, 1807, and the acts supplementary thereto, under the authority of the president of the United States. Liberal appropriations, covering the entire period embraced in the plaintiff's writ, were made for the uses of that department of the coast survey with which the defendant was connected, by the following acts of congress "making appropriations for sundry civil expenses of the government," viz.,—act of July 20, 1868, 15 Stats. at Large 112, $275,000 for the year ending June 30, 1869 ; act of March 3, 1869, 15 Stats. at Large 302, $275,000 for the year ending June 30, 1870 ; act of July 15, 1870, 16 Stats. at Large 303, $391,000 for the year ending June 30, 1871 ; act of March 3, 1871, 16 Stats. at Large 507, $391,000 for the year ending June 30, 1872 ; act of June 10, 1872, 17 Stats. at Large 362, $391,000 for the year ending June 30, 1873 ; act of March 3, 1873, 17 Stats. at Large 519, $410,000 for the year ending June 30, 1874. Various additional appropriations for the same object were made in deficiency bills during the same period.

That here was not a definite and certain fund, set apart for the payment of such sum as might be awarded to this plaintiff, may be conceded, but these large appropriations cannot be overlooked in determining the question before us, and we are unable to entertain a doubt that whenever the plaintiff's damages, or those of any other land-owner, shall have been duly assessed by virtue of the statute under consideration, the sum assessed will be paid without unreasonable delay. That a judgment against an agent of the government, for damages caused by him in executing the requirements of an act of congress, under the direction of the president of the United States, will be promply satisfied, we hold to be reasonably certain. Whether a reasonable certainty in the opinion of the court that such damages will be promptly adjusted, although there may be no property, nor any definite and certain fund provided, to which an injured party can resort if the government should repudiate his claim, is sufficient to relieve the question from constitutional objections, will be considered in another part of this opinion.

But we are not called upon to decide whether a state law providing for the condemnation of land for the permanent occupation of the United States, as for a post-office or custom house, without compensation previously paid or secured, would or would not be unconstitutional.

The question which we have occasion now to determine is, whether the defendant had authority to do the acts justified in his plea. It is not alleged that he has erected, as the statute authorized him to do, any " works, buildings, stations, or appendages " upon the plaintiff's land. If the defendant should petition under the statute, it would not be for a transfer to him nor to the United States of any title to the land, nor of any right to occupy it either permanently or temporarily hereafter ; it would only be for an assessment of the damages already caused. Whether a right might be obtained under a state law to enter on behalf of the United States for the purpose of occupying land permanently, without a previous assessment and payment of damages, is a question which does not arise in this case.

" No constitutional principle, however, is violated by a statute which allows private property to be entered upon and temporarily occupied for the purpose of a survey and other incipient proceedings, with a view to judging and determining whether the public needs require the appropriation or not, and, if so, what the proper location shall be ; and the party acting under this statutory authority would neither be bound to make compensation for the temporary possession, nor be liable to an action of trespass." Cool. Const. Lim., 3d ed., 560. " In the construction of works of public improvement, as railroads or canals, for instance, before it is known what lands will be wanted, preliminary steps, such, for instance, as surveys, are indispensably necessary. These preliminary steps are in themselves a trespass, and may sometimes, *as by the felling of trees,* work actual injury to the proprietor. On the other hand, if payment be not made before the work is actually begun, then, if it be discontinued or left in an imperfect state, the owner might be entirely remediless. In such a conflict of interests the current of decisions seems to tend to establish the rule that the preliminary steps in regard to public works may be taken without making compensation, but that before any definitive act be done toward the construction of the improvement which is in the nature of the assertion of ownership, payment must be made or tendered, or a certain and adequate remedy be provided." Sedg. Stat. & Const. Law, 2d ed., 467. " It is settled that the legislature may authorize railway companies to enter upon lands for the purpose of preliminary surveys, without making any compensation therefor, doing as little damage as possible, and selecting such season of the year as will do least damage to the growing crops." 1 Redf. on Railw., 5th ed., 258. It cannot be overlooked, that the trespasses referred to by Cooley, Sedgwick, and Redfield, although not ordinarily so extensive as those alleged to have been committed by this defendant, are quite similar in their character.

We are not aware that the power of the legislature to authorize an entry upon land for the purpose of making such surveys, being similar to those provided for in our Gen. Stats., ch. 146, sec. 6, has ever been questioned in this state. In *Cushman* v. *Smith,* 34 Me. 256, which was trespass against the defendant, who was in possession of a railroad as mortgagee, for running engines and cars over the plaintiff's land,

this question is elaborately discussed by SHEPLEY, J., and it is held that " to take the real estate of an individual for the public use is to deprive him of his title to it, or of some part of his title, so that the entire dominion over it no longer remains with him," and that " the exclusive occupation of that estate temporarily, as an initiatory proceeding to an acquisition of a title to it, cannot amount to a taking of it in that sense." We are not prepared to hold that a substantial injury to real estate, as by the destruction of trees growing upon it, does not constitute a taking of it, within the meaning of the constitution— see *Eaton* v. *B. C. & M. Railroad*, 51 N. H. 504, 511; but the application of the doctrine of *Cushman* v. *Smith*, to preliminary surveys, seems to be settled by the authorities.

If trespasses of a temporary character may be lawfully committed by a private corporation, in a work preliminary to the construction of a railroad, without compensation at any time, may they not be lawfully committed under the direction of the president of the United States, in executing the provisions of an act of congress with ample provision for the assessment of damages, without requiring payment or security in advance ?   May trees be constitutionally cut, without any compensation, by a private corporation preparatory to constructing a railroad, which cannot be constitutionally cut by the president for an important public use, without payment or security in advance?   Perhaps the injury done by the latter would ordinarily be greater than that done by the former, but can the constitutionality of their acts depend upon the extent of the injury done ?

Whatever reasons may have induced courts to decide that the temporary injuries to which we have referred may be allowed without violating any constitutional rights, a satisfactory ground upon which such decisions may be sustained is the doctrine of necessity.   Those decisions were simply unavoidable.   It is necessity, in a great degree, which justifies the right of eminent domain in all cases.   In *Bloodgood* v. *Mohawk & Hudson Railroad Co.*, 18 Wend. 9, 17, a leading case on this subject, which has been cited as decisive in his favor by the plaintiff's counsel, the CHANCELLOR, in holding that "before the legislature can authorize the agents of the state, and others, to enter upon, and occupy, or destroy, or materially injure, the private property of an individual, except in cases of actual necessity which will not admit of any delay, an adequate and certain remedy must be provided whereby the owner of such property may compel the payment of his damages," recognizes that there may be cases of necessity in which the rule he lays down will not apply.   A similar exception is recognized in other authorities, which sustain the doctrine of *Bloodgood's case*. " The settled and fundamental doctrine is, that government has no right to take private property for public purposes without giving a just compensation ; and it seems to be necessarily implied that the indemnity should, *in cases which will admit of it*, be previously and equitably ascertained, and be ready for reception, concurrently in point of time with the actual exercise of the right of eminent domain." 2 Kent Com., 12th ed.,

339, note *f*. " The maxim of law is, that a private mischief is to be endured rather than a public inconvenience. On this ground rest the rights of public necessity. If a common highway be out of repair, a passenger may lawfully go through an adjoining private enclosure." 2 Kent Com., 12th ed., 338 ; Broom's Maxims 2. The inconvenience of procuring an assessment of damages, or of giving security for their payment in advance of an actual appropriation of land as a site for permanent buildings, or as a reservoir for purposes of flowage, cannot be serious, but in the case of temporary surveys this would be either impossible, or so far impracticable, as to render a right to enter, subject to such conditions, of little or no value, and would greatly obstruct, if not altogether defeat, important public improvements. Does not this case present another instance in which the doctrine of necessity may be properly invoked ?

The practical effect of holding that the defendant could not enter upon the plaintiff's land for the necessary purposes of the coast survey, or that he could not do any substantial injury there after he had entered, without previously paying or securing him for the damage to be caused, would be to deny the right altogether. An assessment of the damages previous to the entry, or even previous to the injury, would be absolutely impossible. The damage which might be done to a land-owner by an entry upon his land " for the purpose of exploring, surveying, and triangulating the said coast, and for the purpose of levelling the same and doing any and all other acts necessary to effect the objects of the said several acts of congress," could rarely if ever be ascertained in advance. At what points the agents of the government might need to erect temporary works, or over what lands they might have occasion to construct temporary roads, no human power could tell before entry. What trees or tree-tops or branches it might become necessary for them to remove from the line of sight could not possibly be ascertained, except by an actual experiment upon the ground. Obviously there could be no hearing before the commissioners for the assessment of the damages until after the mischief was all or nearly all done.

The views of RICHARDSON, C. J., in *Lebanon v. Olcott*, 1 N. H. 345, in overruling an objection to the constitutionality of a statute similar to that taken in the present case, upon the ground that " until it was ascertained by experiment to what extent it would be necessary to erect dams to accomplish the object, and to what extent such dams would cause the water to overflow roads and lands, there could have been no certain data by which such damages could have been ascertained," and that " any opinion of the selectmen on the subject must have been at best only vague and uncertain conjecture equally unsafe to all the parties as a ground of decision," though perhaps not applicable to the case then before the court, might be appropriately expressed upon the case now before us.

But it is said that it would not be impossible to provide for security previous to the entry. Probably it would not ; but we think it would

be entirely impracticable. If security were required, there must be a
tribunal to decide upon its sufficiency ; and it would seem that to make
it a security in fact as well as in name, there must be notice to the
parties interested, and a hearing upon the question how much injury
was likely or liable to be done, and what degree of security was needed.
Until these proceedings had been had, the party entering, though com-
mitting only a technical injury, would be a wrong-doer, and liable to
be forcibly resisted, and his operations must be stopped from step to
step while petitions were being prepared, notices given, hearings had,
reports made, and security furnished.

The provision in the constitution of the United States, cited by the
plaintiff's counsel, which prohibits the taking of private property for
public use without just compensation, was not intended to restrain the
authority of the states. *Withers* v. *Buckley*, 20 How. 84. The framers
of our own constitution appear to have reposed so much confidence in fu-
ture legislatures and courts, that, although they provided that " no part
of a man's property shall be taken from him or applied to the public uses
without his own consent or that of the representative body of the
people," they were not sufficiently solicitous on the subject of com-
pensation to insert any provision respecting it. While it has been
considered that " natural justice speaks on this point where our consti-
tution is silent,"—RICHARDSON, C. J., in *Bristol* v. *New Chester*, 3 N. H.
524, 535,—and that a condition requiring compensation is to be im-
plied, it is not reasonable to suppose it ever could have been intended
that the appropriation of property necessary to the public use, in a case
in which it should be utterly impossible to ascertain the damages in
advance, and utterly impracticable to give security in advance for their
payment, should be frustrated, notwithstanding the highest tribunal
of the state was satisfied that a suitable provision for the assessment
of the damages had been made, and that prompt payment of such
damages when assessed was reasonably certain. A theory of constitu-
tional rights, which requires so much for the purpose of securing so
little, seems quite too fanciful to be sustained. Still, it is insisted that,
however inconvenient or embarrassing it may be to give security in
cases like the present, it is unconstitutional to permit an entry or
injury without it. We may ask the advocates of that doctrine what
prevents its being unconstitutional after the security has been given.
The answer must be, because by means of the security the ultimate
payment of the damages becomes reasonably certain. But we are of
the opinion that, in the case of an entry or injury, under the statute in
controversy, by an authorized agent of the United States, the payment
is reasonably certain without security.

If there must be security in such a case, we have not been informed
by the plaintiff's counsel how it shall be given. It might be by a satis-
factory bond. Then, suppose it should be held that it would not be
unconstitutional to authorize this defendant to enter upon land for the
necessary purposes of the coast survey, provided that he should first
give a bond, with three sufficient sureties, as security for the payment

of damages.  But the same defendant and the same sureties might be selected to act jointly as the agents of the government in entering upon the same land in the same way for the same purposes.  Must they also give a bond with three additional sureties in order to meet a constitutional objection ?  It is difficult to see how, if one were liable as principal and three as sureties, the security could be considered greater than if the whole four were liable as principals in the first instance.  On the contrary, it is easy to see that a land-owner might be quite as certain to receive his compensation promptly in some cases without security as in others with it.  Perhaps it may be suggested that it would be preferable to require that the security should be given, not by a bond, but by a deposit of a sufficient sum in a reliable bank, or by a large appropriation set apart exclusively for the payment of such judgments as should from time to time be recovered against it. But the most solvent bank might become insolvent, and the appropriation, though not diverted from its purpose, might be exhausted without discharging all of the judgments recovered; and it is plain that there might be cases in which, without any security, the certainty of payment would be as great as in other cases after the deposit or appropriation had been made.

How a statute authorizing an entry upon land, provided that the party entering should first give security to the satisfaction of the court for the payment of damages when assessed, would be any less constitutional if it also empowered the court to dispense with security upon satisfactory evidence that there was a reasonable certainty of payment without it, we are unable to see. If it contained no provision for ascertaining in advance whether any or what security was needed, the case would be different, because the legality of the entry, and the right of the land-owner to resist it with force, could not be made to depend on the result of a subsequent investigation as to the necessity for security. But if the legislature, for reasons deemed by the court satisfactory, as in the case of an entry by an authorized agent of the government, dispenses with security upon the ground that none is needed, we are at a loss to perceive how the statute can be considered any less constitutional than if it authorized the court to dispense with security upon satisfactory proof that it was unnecessary.

For aught that we can see, the question, whether there is a sufficient certainty that the damages when assessed will be promptly paid, must rest in the discretion of the court, or it must be held that payment must in all cases precede the taking or injury, and that whenever that shall be impossible there can be no lawful taking or injury.  We see no middle course.  Compensation can be made reasonably but not absolutely certain.  It is not absolutely certain in the case either of an individual or private corporation, or of a state or municipality, even where a fixed and definite fund is provided as security for payment.  It is not impossible that the individual, private corporation, state, or municipality may become bankrupt, and the fund which may be deposited as security may be lost by a burglary or defalcation.  It seems to be

conceded that, where a definite and certain "fund" is provided which is deemed by the court to be adequate security, the appropriation of land becomes complete, and the owner's dominion over it ceases. Though the payment of compensation is reasonably certain, it may even in that case never come; yet his property is gone. What more than that can be said against a taking of property by virtue of the statute in controversy?

It is clear that, in cases in which it is impossible to ascertain the amount of damages in advance, a reasonable certainty of payment is all that should be required. Perhaps this position may not be controverted. Perhaps the question to be determined really is, whether the prompt payment of compensation under this statute is reasonably certain. As we have already intimated, this seems to call for a conclusion upon a question of fact rather than upon a question of constitutional law. Upon that question we cannot doubt. We do not consider the credit of the government, or the good faith of its agents employed or likely to be employed in the service of the coast survey, sufficiently open to suspicion to justify us in holding that prompt payment of damages assessed under this statute is not reasonably certain. It is as certain, for aught we know, as prompt payment of fees to jurors or witnesses on behalf of the government, who are required, without payment in advance, to attend court at the pleasure of the government, sometimes travelling long distances for the purpose.

"Courts will not declare a statute void, as being contrary to the provisions of the constitution, unless the nullity and invalidity of the act are placed, in their judgment, beyond all reasonable doubt." *Rich* v. *Flanders*, 39 N. H. 305.

"But it is to be borne in mind, that in determining the question whether a statute is within the legitimate sphere of legislative action, it is the duty of courts to make all reasonable presumptions in favor of its validity. It is not to be supposed that the law-making power has transcended its authority, or committed under the form of law a violation of individual rights. When an act has been passed with all the requisites necessary to give it the force of a binding statute, it must be regarded as valid, unless it can be clearly shown to be in conflict with the constitution. It is therefore incumbent on those who deny the validity of a statute to show that it is a plain and palpable violation of constitutional right. If they fail to do so, or leave room for a reasonable doubt upon the question whether it is an infringement of any of the guaranties secured by the constitution, the presumption in favor of the validity of the act must stand." "Unless we can say that such a provision [as was made in the case then under consideration] affords no reasonable guaranty that the persons injured will receive compensation, we cannot adjudge the statute to be unconstitutional." BIGELOW, C. J., in *Talbot* v. *Hudson*, 16 Gray 422, 431.

We are of the opinion that the statute in controversy has not been "clearly shown to be in conflict with the constitution;" that it has not been shown to be "a plain and palpable violation of constitutional

right;" that there is " room for a reasonable doubt upon the question whether it is an infringement of any of the guaranties secured by the constitution;" that it cannot be truly said that the provision relating to damages " affords no reasonable guaranty that the persons injured will receive compensation;" and that, tried by these tests, the statute cannot be held to be unconstitutional.

V. The further point was made, in the argument for the plaintiff, that he must at least be entitled to maintain his action until an assessment and payment or tender have been made. Upon this point the plaintiff's counsel have relied on *Ash* v. *Cummings*, 50 N. H. 591, in which it was held that the flowage act of 1868, although it provides for an assessment of the land-owner's damages, does not take away his right to maintain an action of tort at common law to recover damages for such flowage, until there has been an assessment of damages under the act, and a judgment rendered for the damages so assessed, and the amount of such judgment has been paid or tendered to the person aggrieved or damaged. But that act, after pointing out the proceedings to be had for obtaining an assessment of damages and judgment thereon, expressly provides that " no person or corporation shall derive any title from said proceedings, or be discharged from any liability in relation to said premises, until he or it has paid or tendered to the person aggrieved or damaged the amount of such adverse judgment;" and the decision in that case upon this point was founded on this provision. " That an action of tort cannot be maintained for the doing of an act duly authorized by law " is laid down by Judge SARGENT in the opinion of the court (p. 616) as " well settled;" and it is held by the court in the present case that the acts stated in the defendant's plea were " duly authorized by law." "A recovery cannot be had upon a declaration at common law when the evidence shows the grievances to consist of acts authorized by statute, and a specific remedy is given for the same by the statute." *Henniker* v. *Contoocook Valley Railroad*, 29 N. H. 146, 152. " It is not to be forgotten, however, that the proceedings for the assessment and collection of damages are statutory, and displace the usual remedies; that the public agents who keep within the statute are not liable to common-law actions." Cool. Const. Lim., 3d ed., 564. " It seems to be well settled, notwithstanding some exceptional cases, that the remedy given by statute to land-owners for injuries sustained by taking land for railways is exclusive of all other remedies, and not merely cumulative." 1 Redf. on Railw., 5th ed., 334. It cannot be held that the party injured in a case like the present may maintain his action at common law so long as the party entering has not procured—or has not attempted to procure—an assessment under the statute. "Where either party has power to carry into effect the statute remedy, one cannot be in fault more than the other for not beginning first." MARCY, J., in *Calking* v. *Baldwin*, 4 Wend. 672. Either party might have put the special remedy in operation in the present case as soon as the alleged trespasses were committed, and we are of the opinion that no other remedy was open to the plaintiff.

VI. The only remaining ground relied on by the plaintiff's counsel is, that the property taken by the defendant was not necessary for the purposes of the coast survey. This is a question not of law, but of fact. That triangulations, taken at points remote from the ocean, may be necessary to a correct survey of the coast, is well understood; but whether it was reasonably necessary for the defendant to go upon the plaintiff's land for such a purpose, is a question for the jury to determine. The plea states that the defendant was employed by the United States, under the several acts of congress relating to the coast survey, for the purpose of making a survey of the coast of the United States, and that he " entered the plaintiff's close for the purpose of exploring, surveying, and triangulating the said coast, and for the purpose of levelling the same, and doing any and all other acts necessary to effect the objects of the said several acts of congress, and then and there cut down said trees and wood, and committed the said supposed trespasses in the plaintiff's said writ mentioned, to effect the objects of the said several acts of congress, then and there doing no unnecessary damages thereby." To support this plea, the defendant must show that he entered upon the plaintiff's land for the purposes stated, and that the supposed trespasses were reasonably necessary to effect the objects of said acts of congress, otherwise his defence will fail, and he will be liable in this action.

*Demurrer overruled.**

Doe, J., dissenting.

In the special plea, to which the plaintiff demurs, the defendant does not deny that he took the plaintiff's property—*Eaton* v. *B. C. & M. R. R. Co.*, 51 N. H. 504, 511–516, *Thompson* v. *Androscoggin R. I. Co.*, 54 N. H. 545; but he alleges that, acting as an agent of the United States, under and by virtue of certain acts of congress, he took it for the national coast survey. Property taken for that survey is taken for a public use. The power of the national government to take a site for a light-house is its power to take (permanently or temporarily, according to the necessity of the case) a site for the coast survey. The national power of eminent domain may be exercised by the national government. If it could be exercised solely by a state taking property for national use and turning it over to the nation, or if it could not be exercised by the nation without the consent of a state government, it would be a very imperfect national power.

The United States may provide such a process and tribunal as are necessary in the exercise of this power. The defendant does not claim that such a process and tribunal have been provided by the United States; but he relies upon chapter 132 of the General Statutes of New Hampshire, wherein it it enacted that any person, employed under the acts of congress relating to the coast survey, may enter upon lands in

* The foregoing opinion was necessarily furnished to the reporter before the following dissenting opinion was prepare ▲ Every position is considered in this opinion which it was known or anticipate▲ would be taken in the dissenting opinion.

this state, and do anything that may be necessary to effect the objects of said acts; that, if the parties interested cannot agree on the amount to be paid for the damages, either of them may petition the supreme court of the state for an assessment of the damages, who shall refer the same to the county commissioners, who shall hear the parties, and make report as in the case of assessing damages for land taken for highways,—and other like proceedings shall be had thereon as in such cases; and that the person entering may tender to the party injured sufficient amends therefor, and, if the damages finally assessed do not exceed the amount so tendered, the person entering shall recover his costs.

This statute undertakes to authorize the taking of private property necessary for the coast survey by any person employed by the United States in that survey, and the assessment of damages by a state tribunal on the application of either party; but it furnishes no process or tribunal for the condemnation or appropriation of the property for public use, and makes no provision for compensation or security. It assumes to take away the land-owner's property, his rights and his remedies, and to leave him utterly remediless; for the right to have his damages assessed is a mere right to have a certain unavailing authenticity affixed to the amount of his loss.

The defendant does not claim that he was authorized to take the plaintiff's property by any law of the United States. He relies on the acts of congress to show what the coast survey is, and the president's authority to employ him in that business: for authority to take the defendant's property, he relies on the New Hampshire statute, which in terms authorizes him to do what he admits he did.

There is an insufficiency in the plea that renders it unnecessary to consider whether the power of eminent domain can be exercised without the direct action of the legislature condemning certain specific property, and authorizing its conversion to a public use, or the direct action of some duly authorized tribunal appropriating such property to such a use, upon some legal proceeding after notice, and an opportunity for the proprietor to be heard; whether the power of delegating the power of eminent domain is unlimited; whether a general authority can be conferred upon all persons employed in the coast survey, to enter upon any lands, and do anything there that is necessary for the survey, without notice, process, trial, or judgment—*Backus* v. *Lebanon,* 11 N. H. 19, 25, 26, *People* v. *Smith,* 21 N. Y. 595, *Bloodgood* v. *M. & H. R. R.,* 18 Wend. 9, Cooley Const. Lim. 928, Potter's Dwarr. on Stats. 396, Sedgwick on St. and Const. Law, 2d ed., 452; whether a state has the power to take property for the use of the United States— Cooley Const. Lim. 526, *n;* whether such a state power, if it exists, requires compensation to be provided by the state; whether compensation must be provided for by the government that takes the property, or authorizes it to be taken, from its owner; or whether, if the power is exercised by the United States and not by a state, the United States can avail itself of a process and tribunal provided by a state—*Beavin's*

*Petition*, 33 N. H. 89—for the condemnation of the property or the assessment of damages.

The plea is defective, because there is in it no averment of the fact, or of any facts, upon which the court can hold, as matter of law or fact, that, when the plaintiff's property was taken, an authorized compensation was made, or tendered, or waived; or that compensation, for some sufficient legal reason impossible at that time, was legally secured by an authorized indemnity given, fund appropriated, or provision made, by the state under whose authority the defendant claims he took the property, or by the United States for whose use he took it, or by anybody.

The plaintiff is equally entitled to compensation, whether his property was taken by the federal or the state government, or under an authority derived from the one or the other, or both of them. No one professes to doubt the soundness of that proposition, as a general theory; but there is reason to fear that, in practice, the prohibition of the taking of private property for a public use by the state of New Hampshire or by its authority, without compensation, is less distinctly realized, or is, in a vague way, considered less imperative or less emphatic than it would be if the constitution of the state contained the particular formula now commonly employed in American constitutions, "Private property shall not be taken for public use without compensation." The prohibition being thus expressed in nearly all other American constitutions, but not in ours, there is a tendency to a confused notion that the prohibition in this state is less stringent in principle or less vigorous in operation than it is in some other jurisdictions. While compensation is admitted to be necessary, it is suggested that the constitution does not expressly require it; and the suggestion sometimes appears to be made for the purpose of detracting from the extent or force of the admission, and justifying a lax administration of the law. The intimation seems to be, that the rule requiring compensation was introduced and is maintained by a violent judicial effort, and that therefore it may, in some cases, be put in execution with a corresponding degree of inefficiency. An admission thus partially and indefinitely recanted, is too wavering and dubious to be the basis of a judicial decision. The taking of private property for public use, without compensation, is either constitutional or unconstitutional. The question of compensation, in this case, cannot be satisfactorily settled upon any such unstable footing as an admission of the unconstitutionality of such a taking, materially qualified, in an equivocal and indeterminate manner, by the suggestion that the constitution contains no express provision on the subject. This point must be determined absolutely at the outset.

I. There is, in our reports, an uncertainty as to the origin of the rule requiring compensation. It was decided nearly fifty years ago that our constitution is silent on the subject, and that decision seems to stand approved, or, at least, not overruled down to the present time. And yet it has been taken for granted, as a general theory, that a statute authorizing the taking of private property for public use, without

compensation, would somehow or other be void. The rule, supposed to rest for a long time on some unsettled ground, possibly unsound, and certainly not well considered, has taken on a degree of mystery and obscurity; and its strictness and efficiency have not been promoted by the common understanding that its foundation had not been, and perhaps had better not be, thoroughly examined. This is not a fit predicament for such a rule to be in. If it is a rule of the constitution, its force ought not to be abated, or its usefulness directly or indirectly impaired, by a groundless distrust of its authority: if it is spurious, let the truth be known. If it is not a constitutional principle, it ought to be, and its constitutional position should not be involved in any shadow of doubt.

The clause in the fifth amendment of the constitution of the United States, prohibiting the taking of private property for public use without just compensation, is a limitation of national and not of state power. Cooley Const. Lim. 19; Pomeroy Const. Law, sec. 232; Dwarris 400; *Pumpelly* v. *G. B. Co.*, 13 Wall. 166, 176, 177; *R. & G. R. R. Co.* v. *Davis*, 2 Dev. & Bat. 451, 459; *C. R. R.* v. *Greely*, 17 N. H. 47, 64. This is too well settled to admit the doubt suggested in *Pet. M. W. R. Co.*, 35 N. H. 134, 141.

"Natural justice speaks on this point, where our constitution is silent." *Bristol* v. *New Chester*, 3 N. H. 524, 535; *Eaton* v. *B. C. & M. R. R.*, 51 N. H. 504, 510, 511; *Ash* v. *Cummings*, 50 N. H. 613; *Fay* v. *Parker*, 53 N. H. 342, 389.

In 4 N. H. 565, 566, 567, it was held that "the supreme legislative power," "vested in the senate and house of representatives" by the second article of the constitution, is limited by the fifth article to the making of "wholesome and reasonable" laws; that "it is an old maxim of the common law of England, that when an act of parliament is against common right and reason, the common law will control it and adjudge it void; and one object of this provision (the first clause of the fifth article) in our constitution was, to adopt and confirm that maxim of the common law;" that "an act of the legislature, in order to have the force of a statute, must, therefore, be neither repugnant to reason nor to the constitution."

In *P. Bridge* v. *N. H. Bridge*, 7 N. H. 35, 66, in regard to the provision of article 12 of the bill of rights that "no part of a man's property shall be taken from him, or applied to public uses, without his consent or that of the representative body of the people," the court say that "This has always been understood necessarily to include, as a matter of right, and as one of the first principles of justice, the further limitation, that in case his property is taken without his consent due compensation must be provided;" that it is not supposed that the legislature can give authority to take private property for public works of internal improvement "without the assent of the owner, and without any indemnity provided by law;" and that "such a power would be essentially tyrannical, and in contravention of other articles in the bill of rights."

In *C. R. R.* v. *Greely*, 17 N. H. 47, 54, 55, 56, the court say, a state legislature " may make all such laws as do not outrage the rights of the person and of property, upon a proper regard to which civilized society depends so much for its existence; and when we say that it cannot make a law thus obnoxious, we mean rather that society could not exist if such laws were passed, than that the constitution has in terms prohibited them.    *    *    A law providing merely that the property of A should be taken from him and given to B, either with or without a consideration, would be repugnant to the constitution; not, indeed, to the letter of any particular clause contained in it, but to its spirit and design, which throughout the whole discountenances the idea that the property of the citizen is held by any such uncertain tenure as the arbitrary discretion of the legislature in a matter of mere private right, unconnected with any considerations of public utility. Such a law would not be so much in repugnance to the constitution, as it would be to the principles which hold human society together, which, while they recognize the power of the legislature to be supreme, do not admit it to be arbitrary."

" We find no express provision in the constitution of this state requiring compensation to be made for private property taken to the use of the public.    *    *    The anxious care taken in different parts of our own constitution to protect private property from all danger of violation, clearly shows the framers of that instrument to have been as far as possible from any intention to repudiate the well-established maxim of universal law, that private property cannot be taken for public use without just compensation to the owner." *Pet. M. W. R. Co.* 35 N. H. 134, 141, 142.

" The power delegated by the constitution ' to make and ordain all manner of reasonable and wholesome orders, laws,' &c., confers no authority to make an order or law in plain violation of the fundamental principles of natural justice, though the act may not be prohibited by any express limitation in the constitution. For instance, I find nothing in the constitution which in terms prohibits the legislature from making a law to take private property for a public use without making provision for compensation to the owner; yet, because it is contrary to natural justice that property belonging to an individual should be taken from him by the public, or for the public, without paying him the value, to do this is beyond the scope of legislative authority." PERLEY, C. J., in *E. Kingston* v. *Towle*, 48 N. H. 57, 59, 60, 61.

" Although the constitution of this state does not contain, in any one clause, an express provision requiring compensation to be made when private property is taken for public uses, yet it has been construed by the courts, in view of the spirit and tenor of the whole instrument, as prohibiting such taking without compensation." *Eaton* v. *B. C. & M. R. R.*, 51 N. H. 504, 510, 511.

The second article of the constitution, which declares that " the supreme legislative power within this state shall be vested in the senate and house of representatives," is modified by article 44, which gives

the governor a share of that power, and by numerous provisions of the
constitution (including the bill of rights), which establish many bar-
riers beyond which the legislature cannot pass. The entire constitu-
tion being taken together, " the supreme legislative power " of the
governor, senate, and house, is the power of enacting constitutional
laws. It is supreme in the sense of being the highest constitutional
legislative power. The first clause of article 5 authorizes the general
court to make all manner of constitutional, " wholesome, and reason-
able " laws " as they may judge for the benefit and welfare of this
state," that is, all such constitutional laws "as they may judge"
" wholesome and reasonable." MS. Essay of Chief Justice SMITH,
written in 1798 ; *Dartmouth College* v. *Woodward,* 1 N. H. 111, 121 ;
*Com.* v. *Williams,* 6 Gray, 1, 3, 9, 10. It has been repeatedly held in
this state, that although in ascertaining the meaning of a statute it is
not to be presumed an unwholesome or unreasonable law was intended,
yet, if construed in accordance with all the settled legal rules of con-
struction applicable to it, it is, in the opinion of the court, unwholesome
and unreasonable : it is not, on that account, unconstitutional. Article 5
does not give the court such a veto power as the governor has. The
doctrine of 4 N. H. 566 is, that the constitution adopts and confirms
the maxim of the common law, that an unjust and unreasonable act
of parliament is void ; but, if there were such a maxim, it would not
be adopted by the constitution rightly construed,—and there is no such
maxim. 1 Kent Com. 447, 448, 451 ; Cooley Const. Lim. 73, 164–168,
410, *n* 2 ; Sedgwick St. & Const. Law, 2d ed., 154–159 ; Potter's
Dwarris on St. & Const. Law, 76–81 ; Bishop First Book of the
Law, secs. 88–91 ; 1 Hurd Law of Freedom and Bondage, secs. 174,
175 ; Fortescue De Laud, ch. 16, Amos' *note ; Flint R. S. Co.* v. *Fos-
ter,* 5 Geo. 194, 201.

In *Dr. Bonham's case,* 8 Rep. 107, 118, COKE, holding that a certain
act of parliament did not make a man a judge in his own case, said,—
" It appears in our books that in many cases the common law will
control acts of parliament, and sometimes adjudge them to be utterly
void ; for when an act of parliament is against common right and
reason, or repugnant, or impossible to be performed, the common law
will control it, and adjudge such act to be void." In *Day* v. *Savadge,*
Hob. 85, 87*a,* HOBART, repeating COKE, said,—"An act of parliament,
made against natural equity as to make a man judge in his own case, is
void in itself ; for *jura naturae sunt immutabilia,* and they are *leges legum.*"
In *London* v. *Wood,* 12 Mod. 687, HOLT declared that the observation of
Lord COKE was not extravagant, but was a very reasonable and true say-
ing. Campbell calls it " a foolish doctrine," which he had often heard
quoted in parliament " against the binding obligation of obnoxious stat-
utes "—1 Camp. Ch. Justices (Life of Coke), ch. 8, p. 341, 3d Eng.
ed. ; and he suggests that the authorities upon which COKE relied do
not justify a judicial repeal or veto of an act of parliament, but, so far
as they are at all relevant, resolve themselves into a question of con-
struction. All of them of any importance seem merely to recognize

the rule of construction applied by Judge BELL, when he said, in *Willard* v. *Harvey*, 24 N. H. 344, 354,—" In all such cases, it must be understood that no legislature could have intended to violate the constitution, or to tread under foot the great principles of justice : and such a proviso, limiting the construction of the statute, must be implied as will prevent injustice." 41 N. H. 555 ; Sedgwick St. and Const. Law 164–169.

It is true, as COKE says, that " if an act of parliament gives to any to hold, or to have conusant of all manner of pleas arising before him within his manor of D., yet he shall hold no plea to which he himself is party ; for, as hath been said, *iniquum est aliquem suae rei esse judicem*." But this, as Campbell observes, rests on an implied exception. The statute would not be held void, and the intent of parliament would not be defeated, in whole or in part ; but, upon settled common-law rules of construction, it would be held that the intent of parliament and the meaning of the statute were, not to give the judge jurisdiction of his own cases. The literal construction would not be adopted. But if the act expressly conferred jurisdiction " in the judge's own cases," or if it clearly appeared that such cases were in the mind of parliament, and that the intention was not to except them, the literal construction, or any other by which such intent was legally ascertained, would prevail ; and the statute would be as valid as if it were not in conflict with natural justice. 1 Bl. Com. 91. Parliament could use language explicit enough to show an intent to authorize such a conflict : but it would be reasonable to presume that they did not entertain such a design, and that they would not have included it in a general provision for the administration of justice, but would have declared it in terms specially and peculiarly descriptive of so peculiar a scheme, and of the particular class of cases in which the common course of justice, and the universal practice of the country, were to be reversed.

All this is judicial construction, that is, finding the legal meaning of words used by parliament ; and it stands in striking contrast with the power of holding that an unjust statute, when its legal meaning is found, is void on the ground that parliament has no authority to make an unjust law. The distinction may not have been clearly marked in the mind of COKE, in 1609, when *Dr. Bonham's case* was decided. Various causes have contributed to uncertainty in the construction of statutes, and to obscurity in the boundary between legislation and interpretation. Sedgwick St. & Const. Law 183 ; *Giddings* v. *Browne*, Hutch. Mass. Coll. 287.

When an ecclesiastical organization was legally authorized to interpret every rule of the divine law (whether naturally or miraculously revealed), and to control and represent the moral sense of the nation, it was hardly necessary to draw the line between the jurisdiction of civil society and the jurisdiction of conscience, because the sacerdotal power was practically absolute on both sides of the line. When church and state were one, the distinction between temporal and spiritual in-

terests, between secular affairs and the domain of faith and morals, was an unprofitable and often a dangerous speculation. In a united, religious, and political despotism, it might well be said that the law of reason, that is, the divine law revealed naturally by human reason (meaning, of course, that held by the ecclesiastical authorities), was supreme, and that an act of parliament in conflict with it would be void. Doctor and Student, Dial. 1, ch. 1, 2, 4. The surviving traditions of that period, combined with an imperfectly developed boundary between legislation and interpretation, might have led COKE into the error of holding that an unreasonable statute was adjudged void by that system of law which he regarded as the perfection of reason. On the other hand, a statute, controlled by the common law and adjudged void for injustice, may have been, in his mind, the same as its literal meaning controlled by the common-law rules of construction, and adjudged not to be the real meaning. Potter's Dwarris 78, 79. The theory of adjudging a statute void for injustice or unreasonableness (in the strict sense of the expression), was not generally accepted in his time or since, and has long been understood to be erroneous. The subject is nowhere so well considered as by Judge GRAY, in Quincy's Mass. Rep., 520–529.

When it is said that the right of self-defence of person, habitation, or property, against one who manifestly intends and endeavors, by violence or surprise, to commit a known felony upon either, is founded in the law of nature, and is not and cannot be superseded by the law of society — Foster C. R. 273, 2 Kent 15—the meaning is, not that society cannot legally prohibit self-defence, but that, in certain cases, society cannot in fact provide a substitute or equivalent for it. In those cases of emergency and necessity in which individuals cannot resort for protection to the law of society, because the law of society cannot furnish protection, that law, recognizing its own inability to supersede the natural remedy, adopts and maintains it as a legal one.

When Blackstone says that the law of nature, being dictated by supreme power, is, of course, superior in obligation to any other; that no human laws are of any validity if contrary to it; that such of them as are valid derive all their authority from it; and that if any human law should enjoin us to violate the divine law by committing murder, we are bound to transgress that human law,—he means, as the context shows, that we are bound in the forum of conscience. 1 Bl. Com. 41, 42, 43, 54, 91, 123. He means the moral supremacy of the moral law, asserted by Cicero when he declared that neither the senate nor the people can give us any dispensation for not obeying the universal law of justice, and that whatever is just is the true law, and cannot be abrogated by human enactments. He does not mean that a person can be legally bound or authorized to officially disregard a law which it is the legal duty of his office to enforce.

The duty of obeying the divine law when human law is in conflict with it, on a point of morals or religious faith, is everywhere taken for granted. But this duty does not legally require or empower

a judge or other officer of the government to officially nullify a law which he is under an express official oath or implied official obligation to officially maintain. By resignation he may throw off an official duty which he cannot conscientiously perform. He may refuse to obey. If he is not a non-resistant, he may exercise the moral right of revolution declared in article 10 of the bill of rights. But however pressing his moral duties, he cannot legally justify an official violation of an official duty. The constitution authorizes the legislature to make constitutional laws : and it requires the court to be sworn to officially support the constitution, and to perform the duties of their office agreeably to the constitution and the human laws of the state; not agreeably to that constitution and those laws supplemented or modified by the divine, natural, or moral law, or the principles of reason and justice. While it recognizes the divine government and the unalienable rights of conscience, it does not establish anarchy by legalizing every principle and practice that may be approved by anybody's interpretation of the higher law, nor authorize the court to destroy the constitution and laws which they are commissioned to administer. A statute, authorizing the taking of private property for public use without compensation, cannot be held void on the ground that " natural justice speaks on this point where our constitution is silent."

The defence in this case is an alleged exercise of the power of eminent domain, by the legislature of New Hampshire, in chapter 132 of the General Statutes. This statute authorizes the taking of the plaintiff's property for the public use of the coast survey. If his property can be constitutionally taken under the statute, without any legal provision made for his compensation, the court cannot declare such taking to be illegal, or hold the plea to be insufficient on the point of compensation.

Eminent domain is the public power of making a compulsory purchase of private property for public use ; and payment (either made, or, by agreement of the parties, to be made) is an essential part of the legal idea of a purchase, voluntary or compulsory. Voluntary, and without payment, it is a donation : compulsory, and without payment, it is robbery. If the constitution does not require payment as a condition indispensable to the legality of the compulsory purchase of the plaintiff's property, natural justice does not speak on the subject with any legal authority, or with any moral authority, that the court are at liberty officially to obey. The plaintiff's property was compulsorily taken, without payment, or legal security given, or legal provision made for payment. Was that a constitutional or an unconstitutional proceeding ? If it was a violation of the constitution, the plea is bad : if the constitution is silent on the point of compensation, the plea is not defective on that point. Is the constitution silent ?

This question is to be answered, not by the mere letter of the instrument, which may be too narrow, nor by its general spirit alone, which may be too broad, but by the letter of some particular clause or clauses, expounded by the general spirit, by history, and by all perti-

nent rules of interpretation. *R. & G. R. R. Co.* v. *Davis,* 2 Dev. & Bat. 451, 459, 460. Nothing so strict as a literal construction, or so loose as a general spirit, but the text, understood in the reasonable sense in which it would be likely to be understood by those who proposed and those who ratified it, is the constitution that was adopted and established by the popular vote. If it forbids the robbery of the citizen by the public authority, we may be sure the prohibition can be found in plain words. Among all its distinct and explicit provisions for the security of private rights, a guaranty against the open and avowed robbery of the individual by the public was not dimly intimated, nor left to be inferred by an abstruse process of reasoning from an ambiguous or recondite passage, or from anything so general as the spirit of the whole instrument. Is there a single clause, or any number of clauses, by the plain meaning of which such robbery is prohibited?

"All men have certain natural, essential, and inherent rights; among which are the enjoying and defending life and liberty, acquiring, possessing, and protecting property, and, in a word, of seeking and obtaining happiness." Bill of Rights, art. 2.

"Every member of the community has a right to be protected by it in the enjoyment of his life, liberty, and property. He is therefore bound to contribute his share in the expense of such protection, and to yield his personal service when necessary, or an equivalent; but no part of a man's property shall be taken from him, or applied to public uses, without his own consent or that of the representative body of the people: nor are the inhabitants of this state controllable by any other laws than those to which they or their representative body have given their consent." Bill of Rights, art. 12.

The declaration that "no part of a man's property shall be taken from him, or applied to public uses, without his own consent or that of the representative body of the people," prohibits, not the compulsory taking of property without compensation, but the compulsory taking, by taxation or otherwise, by the authority of any other branch of the government than the legislature. It is a mere specification or application to a particular subject of the general provision that the inhabitants of this state are not controllable by any other laws than those to which they or their representative body have given their consent. The article declares the obligation of every member of the community to contribute his share of the expense of protecting every member's enjoyment of life, liberty, and property. But English experience had shown the necessity of prohibiting the levy of the contribution by executive authority, without the consent of parliament; and, although that case would have been amply provided for by the general provision in the last sentence of the article concerning the law-making power, the specification was inserted in accordance with a system of giving emphasis to the declaration of general rights, by repetition and recital of particulars on points where special difficulties and dangers had been encountered in England or America.

The prohibition of the compulsory taking of property without legisla-

tive consent, in article 12, except in being aimed at all other methods of taking as well as taxation, seems not to differ from "Art. 28. No subsidy, charge, tax, impost, or duty shall be established, fixed, laid, or levied, under any pretext whatsoever, without the consent of the people, or their representatives in the legislature, or authority derived from that body," which is a declaration of the doctrine for which, in the case of ship-money—*King* v. *Hampden*, 3 St. Trials 825—the defendant contended unsuccessfully,—the doctrine of the petition of right, that it is one of the inherited rights and liberties of Englishmen that no man can be "compelled to make or yield any gift, loan, benevolence, tax, or such like charge, without common consent, by act of parliament,"—the doctrine of the English bill of rights, that it is one of the ancient and indubitable rights and liberties of the English people, that money cannot be levied "for or to the use of the crown, by pretence of prerogative, without grant of parliament,"—a doctrine over which the contest between the crown and the English people had been long and vigorous, and the maintenance of which, in the form of no taxation without representation, was one of the avowed objects of the American revolution. Had there been similar contests over the question whether the legislative power could make or authorize a compulsory purchase of private property without payment, a specific, literal prohibition of that particular kind of robbery would have been inserted in the bill of rights. Particular provisions of English law, general history and tradition, and their own experience had made American statesmen of the revolutionary period familiar with the necessity of prohibiting the compulsory taking of property without the consent of the acknowledged representatives of the people; but the danger of property being taken, by pretence of a compulsory legislative purchase, without payment, was not pressed upon their attention by any of the great historical invasions and defences of English liberty, which guided them extensively in their constitutional work. That specific form of danger has been chiefly brought into notice by public improvements, introduced since the authors of the constitution rested from their labors.

An American bill of rights is a declaration of private rights reserved in a grant of public powers,—a reservation of a limited individual sovereignty, annexed to and made a part of a limited form of government established by the independent, individual action of the voting class of the people. The general purpose of such a bill of rights is, to declare those fundamental principles of the common law, generally called the principles of English constitutional liberty, which the American people always claimed as their English inheritance, and the defence of which was their justification of the war of 1776. *Jones* v. *Robbins*, 8 Gray 329, 343, 344. All or nearly all the guaranties and prohibitions of our bill of rights were supposed to be necessary here because they had been necessary in England. Many of them were originally taken almost literally from English documents (constitutional in the English sense), where they had been recorded, after violent controversies, as

authoritative acknowledgments and affirmations of ancient English liberties. The specification of many of them is due to particular events in English history, which from time to time called for declarations and guaranties that introduced no new principle. Innovation was always disclaimed. When some peculiar violation of an ancient general right was resisted and suppressed as an innovation, so much of the violated right as was vindicated on that occasion was put on record, and solemnly declared to be the undoubted and immemorial birthright of Englishmen. Details of this kind, occupying much space in American bills of rights, and, by their historical associations, engrossing attention and magnifying their apparent importance, have been influential in disseminating the idea that broad and comprehensive rights of life, liberty, and property, expressly declared to be natural, essential, and inherent, and reserved in the organic law, are not constitutional rights, and cannot be practically upheld by the court—Sedgwick St. & Const. Law, 2d ed., 153, 154, 407—in any other cases than those mentioned in accompanying specifications that do not profess to comprise the entire reservation, and are necessarily partial and imperfect because they were drawn with reference to particular instances or modes of infringing or securing the general rights reserved. Specifications and details of administration, inserted by reason of an anxiety to strengthen the sweeping reservation of essential rights, do not reduce that reservation to an abstraction, nor limit the extent or energy of its operation. They illustrate its power by practical examples; they require its continued application to such cases as the principle of it has been applied to on certain great historical occasions; they prohibit particular violations; they furnish particular safeguards: instead of destroying the general reservation, they reinforce it.

The general principle of article 12 of our bill of rights, that the people are not controllable by any other laws than those to which they or their representative body have given their consent, is not exhausted, or paralyzed, or deprived of any effect, by the specifications that property shall not be compulsorily taken for public use without the consent of the representative body of the people; that property shall not be taken by taxation, without the consent of the people or the legislature; that laws shall not be suspended without legislative authority; and that no civilian shall be subjected to martial law but by authority of the legislature. These incomplete specifications, declaring the applicability of the general principle to certain cases, leave the principle as applicable to other cases as if the specifications had been omitted; and a similar view is to be taken of specifications of instances and methods in which the general reservation of the rights of life, liberty, and property is to be maintained.

The danger that had been generally regarded, in England, as the greatest, was the abuse of executive power. It was stipulated in the Great Charter, that " No scutage or aid shall be imposed in our kingdom, unless by the Great Council of our kingdom, except " a reasonable aid " to redeem our person, and make our eldest son a knight,

and once to marry our eldest daughter;" that "No constable or bailiff of ours shall take corn or other chattels of any man, unless he presently give him money for it, or hath respite of payment by consent of the seller;" that "No constable shall distrain any knight to give money for castle-guard, if the knight himself shall keep ward;" that "No sheriff or bailiff of ours, or any other person, shall take horses or carts of any freeman for carriage, except by consent of the owner;" that"Neither we nor our officers shall take any other man's timber for our castles, or other uses, unless by the consent of the owner of the timber." The dangers of executive extortion and robbery were guarded against in our constitution, by enlarging and generalizing the declarations of the Great Charter, the petition of right and the English bill of rights, on that head, and prohibiting the compulsory taking of property by taxation, or otherwise, without legislative authority. If there had been, in England, numerous and grievous violations of the right of property by legislative compulsory purchase without payment, the right would probably have been vindicated against that kind of robbery, and a formal declaration of the right, in the particular in which it had been violated, would probably have been put on record there, and copied into American bills of rights; but such a violation of the right was not one of the imminent dangers exhibited in English history.

The Massachusetts body of liberties provided that " no man's cattle or goods, of what kind soever, shall be pressed or taken for any public use or service, unless it be by warrant grounded upon some act of the General Court, nor without such reasonable prices and hire as the ordinary rates of the country do afford: and if his cattle or goods shall perish or suffer damage in such service, the owner shall be sufficiently recompensed." The second article of the Vermont constitution of 1777 was, " that private property ought to be subservient to public uses, when necessity requires it; nevertheless, whenever any particular man's property is taken for the use of the public, the owner ought to receive an equivalent in money." The twelfth and thirteenth articles of our bill of rights were substantially copied in 1783 from the eighth article of the Pennsylvania bill of rights of 1776. The tenth article of the Massachusetts declaration of rights of 1780, as reported to the constitutional convention by a committee, was a substantial copy of so much of the eighth Pennsylvania article as was afterwards copied into our twelfth. This the Massachusetts convention amended by adding,— "And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor." In 1790, New Hampshire ratified those amendments of the constitution of the United States which contained the prohibition of the taking of private property for public use without just compensation.

The fact, that under these circumstances a similar specific prohibition was not inserted in our constitution in 1783 or 1792, is evidence on the question whether it was the intention of New Hampshire to prohibit such taking. But the omission is entitled to very little weight,

because the public mind was not then and never had been agitated by the danger of such a legislative violation of the general right of property, but was occupied with the discussion of other matters. If the general right of property had been frequently, seriously, and notoriously invaded, in England or America, by so extraordinary a proceeding as the open and avowed robbery of individuals by authority of an express statute enacted by the representative body of the people; or if such an invasion had been threatened or attempted to such an extent as to occasion general alarm and call for resistance; or if, for any reason, the general right seemed likely to be in special danger of such an invasion,—a specification of the general reservation of the general right, applying that reservation to cases of such robbery, would not have been omitted. If such a specification would have restricted and weakened the general reservation, its omission is not a misfortune. Other methods of infringing the reserved general right may hereafter be devised, if the reservation can be so perverted as to be no security against any form of violation that was not dreaded enough, in this state, in 1783 or 1792, to be denounced in a repetitious specification.

If the right of acquiring, possessing, and protecting property is a constitutional right, the compulsory taking of the plaintiff's property without payment was an unconstitutional violation of the right, as direct and gross as can possibly be committed. Such a wrong is not an exercise of the power of eminent domain. A compulsory purchase of private property for public use without payment is not a definition of eminent domain, but a florid and periphrastic description of something else. The outrage is not legalized or palliated by the technical, rhetorical, and contradictory description. Calling it a purchase does not make it a purchase. Being compulsory, and being without compensation, it is simply pillage,—an infraction of the constitution, as plain as can be conceived of, if the right of acquiring, possessing, and protecting property is a constitutional one.

"All men have certain natural, essential, and inherent rights; among which are the * * acquiring, possessing, and protecting property." Bill of Rights, art. 2. This is not silence, nor rant and declamation, nor advice and exhortation; it is an express declaration of the private right of proprietorship. It is attached to the constitutional grant of governmental powers, as a limitation of the grant, a declaration of a right not surrendered to society. Whether it be called a declaration of the reserved right, or a reservation of the right, or a guaranty of it, or a prohibition of the violation of it, is immaterial. It is a reservation that makes the right a constitutional one. It is a guaranty of the plaintiff's natural and common-law right to own property. It is a prohibition of the robbery of the plaintiff by the government. It needs not the specification, " private property shall not be taken for public use without compensation," to apply it to this class of cases. It does not leave the court exposed to any temptation to set up an illimitable jurisdiction on the doctrines of natural justice, the maxims of universal law, or the principles that hold society together. So far as authorities

of that kind are opposed to a compulsory taking of the plaintiff's property without compensation, they are adopted and expressed in the reservation of the right of owning property.

As the broadest, literal sense of this reservation is qualified by the constitutional grant of legislative powers (including the powers of police, taxation, and eminent domain), so that grant is qualified by this reservation, as well as by other guaranties and prohibitions set forth in the bill of rights. If the general reservation of the rights of life, liberty, and property were not qualified by the grant of legislative power, individual rights would be absolute, and the constitution would contradict itself. If the grant of " supreme legislative power " were not qualified by any constitutional provisions, that power would be unlimited. The entire instrument is to be read together. No clause, whatever its literal purport, has any broader legal signification than that which allows to every other clause its due share of the aggregate meaning of a document establishing a form of government consistent and free. The legislative power of taking property by taxation does not conflict with the right of proprietorship. Their consistency is explained in articles 3 and 12 of the bill of rights, and article 5 of the second part of the constitution. Property taken from its owner by taxation, is taken to pay the expense of protecting the owner's life, liberty, and property. That is the theory of the constitution. A part of his property is taken for the protection of the rest, and of all his legal rights. By taxation, the right of ownership is not denied or violated, but acknowledged and defended; and the constitutional destruction of property by the police power stands on similar ground. Civil liberty is natural liberty, modified by the necessities and secured by the sanctions of civil society. The private right of ownership, reserved by the constitution, is the natural right qualified by the powers conferred, by the same instrument, upon society to enable it to protect that right, and to accomplish the other constitutional objects of its organization. " To-say that the grant of legislative power includes in it the right to attack private property, is equivalent to saying that the people have delegated to their servants the power of defeating one of the great ends for which the government was established." Potter's Dwarris on St. 374.

The power of eminent domain, or the public right of taking private property for public use by compulsory purchase, is not expressly granted. If it is a part of the general power of making constitutional laws, it is bounded by the reservation of the private right of ownership. If it is implied from the prohibition of taking property, or applying it to public uses, without the consent of the owner or the representative body of the people, the express reservation of the private right is not annulled by the implied grant of public power. Neither the general power of constitutional legislation, nor the special power of taking property for public use, can, by robbing an individual under pretence of a compulsory purchase, override his reserved right of owning property. A necessary, compulsory purchase of private property for public use,— without payment, as plain a violation of the constitution as of the

eighth commandment,—with payment, is a recognition and mainte-
nance of the reserved right.

The reserved right is not to be prostrated by unmeaning words, or
by words used in an undefined and indeterminate sense. The plea in
this case cannot be sustained by any general and indefinite statement
about the right of eminent domain being an inherent sovereign power,
or a high prerogative of sovereignty, that gives to the legislature the
control of private property for public use. That power is a manu-
factured and restricted one : it is created by the constitution. The
constitution does not create the right of property, but declares it to be
natural, essential, and inherent, and guarantees it as such against all
the powers of government, or (to speak in strict accordance with the
constitutional theory) reserves it in the grant of those powers. If the
character of sovereignty belongs to those artificial and limited powers, it
belongs, in no less measure, to the natural rights of life, liberty, and
property, for the protection of which those powers were invented. If
there is any subordination of dignity or authority between those rights
and those powers, the former do not fall into the inferior rank. The
feudal power of resuming fiefs, based upon original revocable grants of
all landed property by the sovereign—Cooley Const. Lim. 524, *n,*
1 Redf. on Railw., secs. 63, 1, 3, *R. & G. R. R. Co.* v. *Davis,* 2 Dev.
& Bat. 451, 456—is not given to the public by our organic law. The
idea of such a power being inherent in all governments, and requiring
no constitutional provision to give it force, is inconsistent with Ameri-
can principles, and with the declaration of the New Hampshire bill of
rights, that " When men enter into a state of society, they surrender
up some of their natural rights to that society in order to insure the
protection of others." Whether this is or is not the true theory of
government in general, it is, in its legal sense, a statement of the New
Hampshire theory, sufficiently accurate for legal purposes. It is the
theory which the people of this state, in 1783, voted to adopt, and which,
since that time, has been the constitutional theory that the court is
bound officially to support. It is the opposite of the doctrine of feudal-
ism and despotism, that all private rights are derived from the grace
and favor of some other sovereign power than that bestowed by nature
upon the individual members of society.

The private right of acquiring and possessing property *is not* essen-
tial, as the bill of rights declares it to be, if the government may vio-
late it at any time, and to any extent, by unmitigated rapine. It is
not a constitutional right, if the public can constitutionally confiscate
all property that it can in fact convert to his own use. The reserva-
tion of this private right is one of several reservations, general and
special, that include substantially the whole bill of rights ; and it must
be construed, like the others, to mean something. It is qualified by
other constitutional provisions, by the powers of police, taxation, and
eminent domain : its application to particular cases may depend upon
various considerations foreign to this case : exceptions may be implied by
legal construction,—but no constitutional provisions, no considerations,

no rules of construction, can render it wholly ineffectual, and expunge that part of the record.

The second article of the bill of rights, being practically administered as a constitutional reservation, limiting the legislative power over the natural and common-law right of " protecting " property—*Aldrich* v. *Wright*, 53 N. H. 398—must be an equally operative reservation of the natural and common-law right of " acquiring " and " possessing " property.

The declaratory form of the article is not less effective than any other form.  The legal idea of a bill of rights is a declaration of private rights, annexed to and made a part of a constitutional grant of governmental power.   Reservation is, in general, the purpose and legal meaning of such declaration.   For exceptional reasons, applicable to the construction of article 10, the right of insurrection there declared is evidently a moral right, not reserved as a legal one.   But many of the most important constitutional rights are reserved in terms much less imperative than " shall " and "shall not."  The right of petitioning for a redress of grievances (the plaintiff's sole remedy, if the plea is good) is reserved by a simple declaration of the right, without a word literally signifying a command or prohibition.

Compensation is not rendered unnecessary by the fact that it may be made in government notes.   The less they are worth, the more of them is the plaintiff entitled to.   Whether the nominal market value of property does or does not keep itself precisely adjusted to a depreciated currency, and whether such a currency is better or worse than any other, the right of property is not violated, in contemplation of law, by payment in such things as are held to be constitutional cash by the highest constitutional authority.

The construction of the reservation of the right of owning property is not to be influenced by such English precedents, or English discussions, as proceed upon the ground that in England there is no constitution, in the American sense, limiting the power of parliament.

Nor is the reservation to be relaxed in cases to which, upon legal rules of construction, it is applicable, by the fact that there have been cases to which it has been construed not to be applicable.   Instances were formerly common, especially in the surviving remnants of the primeval slavery of married women, and in the absolute bondage of other persons, where it was not applied.   Exceptional cases, standing on the historical rule of interpretation (correctly or incorrectly used), have been sufficiently numerous and striking to disparage the reservation, and give it, in the public estimation, the place of an extravagant, fanciful theory of enthusiasts excited by their struggle for independence.   Such cases have done much to render it inert and useless for legal purposes.   Customs, old enough and strong enough to be considered historical facts, grown into legal facts, and parts of or exceptions to the common law, have raised the presumption that they were intended to be excepted from the operation of statutory or constitutional provisions by the letter of which they would be abolished,

as well as from the operation of the general principles of the un-
written law by which their existence would not be tolerated. General
words do not always extend to every case which falls literally within
them. *Cope* v. *Doherty*, 2 De G. & J. 614. The words " all persons,"
in some cases, have been construed not to include minors, married women,
or slaves. Bac. Abr., Statute, I, 6 ; Doctor & Student, Dial. 1, ch. 16 ;
*Reniger* v. *Fogassa*, Plow. 13, 19 ; *Partridge* v. *Strange*, Plow. 88 ;
*Stowel* v. *Zouch*, Plow. 364 ; *Eyston* v. *Studd*, Plow. 465, 468 ; *Hal-
lowell* v. *Gardiner*, 1 Greenl. 93, 101 ; *Somerset* v. *Dighton*, 12 Mass.
383 ; *Winchendon* v. *Hatfield*, 4 Mass. 123, 129. The words, " every
male inhabitant," in the 28th article of the second part of our constitu-
tion, copied from art. 1, sec. 2, ch. 1, of the Massachusetts constitu-
tion, are construed not to include aliens. 7 Mass. 524–526 ; 8 N. H.
574, 575 ; *Davis* v. *School District*, 44 N. H. 398, 405.

In 1772, when the number of slaves in England was estimated at 14,000
or 15,000, and their value at not less than £700,000 sterling, the imme-
morial custom by which they were held was not strong enough, in the
opinion of MANSFIELD and the other judges of the King's Bench, to be
an exception ; and it was decided, in *Sommersett's case*, to be illegal at
common law. But slavery (whether of the African, chattel type, tech-
nically sufficient for the action of trover, or of some other substantially
equivalent kind of involuntary servitude, is immaterial) had in fact ex-
isted in England by the custom of the world, long established in that
country. It might be called a part of the common law because it was made
lawful by custom, but it was a violation of elementary common-law princi-
ples ; and therefore, whether it be called a common-law or an anti-com-
mon-law custom, it was an exception. Upon those principles slavery is
continuous personal violence, duress, assault and battery, and false im-
prisonment, for which an action of trespass and an indictment will lie.
By the exceptional custom suspending the operation of general prin-
ciples in certain cases, A could justify his violence upon B on the
ground that B was his slave property. There was no general common-
law principle by which it could be determined which one of them was
the owner, and which one was the property. The title emanated from
an act of violence depriving a free person of liberty, and converting
that person into property. But for hundreds of years before 1772, title
could not originate in England in that way. By the law of that coun-
try, no freeman of any color could be forcibly enslaved without author-
ity of parliament. The slave title was derived from a foreign country
where a free person had been overcome by a use of force, which, in
England, would be an indictable offence. Personal violence, begun in
Guinea, was continued in London. If it had begun in London, it
would have been, from beginning to end, a criminal trespass. Its con-
tinuance there was made legal by a custom which was as flagrant a
violation of the general rule of the common law as it was possible for a
trespass to be. The custom prevailed throughout the world. In the
sense of being everywhere legal, it was universal law. It was none
the less an exception to fundamental and vital principles of the com-

mon law. The exception was brought to this country with the common law ; and the decision in *Sommersett's case* was not followed here. The thirteen original states were all slave states when they declared their independence in 1776.

The reservation of the natal right of equal freedom in the first article, and of the natural, essential, and inherent rights of life, liberty, and property in the second article of the New Hampshire bill of rights of 1792, is a literal copy of that in the bill of rights of 1784, and is, in substance and almost in letter, the same as that in the Massachusetts declaration of rights of 1780. It is, in Massachusetts, a practical security of personal liberty, an operative prohibition of slavery. If it has been correctly construed there, it ought to be construed to have the same effect here ; and, if it is a prohibition of slavery, it is a prohibition of robbery. A statute might have been enacted authorizing the defendant, or any other person employed in the coast survey, to forcibly take the plaintiff as a slave for such public service as cutting down his own trees, and doing the other work which he complains has been done on his land, and to sell him when the public had nothing more for him to do. If such a statute would be a violation of the reservation, a statute authorizing public agents to rob him of his property would be a violation of it. If the reservation is an effective guaranty of the right of " enjoying and defending life and liberty," it is an effective guaranty of the right of " acquiring, possessing, and protecting property."

" In the first action involving the right of the master, which came before the supreme judicial court after the establishment of the constitution [of 1780], the judges declared that, by virtue of the first article of the declaration of rights, slavery in this state was no more." *Winchendon* v. *Hatfield*, 4 Mass. 123, 128.

" In less than a year after the constitution was adopted and went into operation, it was solemnly adjudged by this court that negro slavery did not exist in the commonwealth, and that, had it previously existed, it would have been abolished by this article." Sedgwick, J., in *Greenwood* v. *Curtis*, 6 Mass. 370 *n. ;* New Am. Cyclo., article " Sedgwick."

" How or by what act particularly slavery was abolished in Massachusetts,—whether by the adoption of the opinion in *Sommersett's case*, as a declaration and modification of the common law, or by the declaration of independence, or by the constitution of 1780,—it is not now very easy to determine, and it is rather a matter of curiosity than of utility ; it being agreed on all hands that if not abolished before, it was so by the declaration of rights.   *   *   By the constitution adopted in 1780, slavery was abolished in Massachusetts, upon the ground that it is contrary to natural right and the plain principles of justice. The terms of the first article of the declaration of rights are plain and explicit. 'All men are born free and equal, and have certain natural, essential, and unalienable rights ; among which may be reckoned the right of enjoying and defending their lives and liberties ; that of

acquiring, possessing, and protecting property.' It would be difficult to select words more precisely adapted to the abolition of negro slavery. According to the laws prevailing in all the states where slavery is upheld, the child of a slave is not deemed to be born free: a slave has no right to enjoy and defend his own liberty, or to acquire, possess, or protect property. That the description was broad enough in its terms to embrace negroes, and that it was intended by the framers of the constitution to embrace them, is proved by the earliest contemporaneous construction, by an unbroken series of judicial decisions, and by a uniform practice from the adoption of the constitution to the present time." *Com.* v. *Aves,* 18 Pick. 193, 208, 209, 210.

" In some of the states [at the time of the adoption of the constitution of the United States] large numbers of slaves were held; in others, a few only; but some, it is believed in all, except Massachusetts, in which slavery was considered as abolished, by the declaration of rights, adopted as part of the constitution of 1780." *Sims's case,* 7 Cush. 285, 295, 296.

" The first and fundamental article of our declaration of rights, * * *proprio vigore,* not only abolished every vestige of slavery then existing in the commonwealth, but rendered every form of it thereafter legally impossible. That article has always been regarded not simply as the declaration of an abstract principle, but as having the active force and conclusive authority of law." *Parsons* v. *Trask,* 7 Gray 473, 478.

" It was in Massachusetts, by the first article of the declaration of rights prefixed to the constitution adopted in 1780, as immediately afterwards interpreted by this court, that the fundamental axioms of the declaration of independence—' that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness '—first took at once the form and the force of express law: slavery was thus wholly abolished in Massachusetts." *Jackson* v. *Phillips,* 14 Allen 539, 563 ; *Oliver* v. *Sale,* Quincy's Mass. Rep. 31, Judge GRAY's *note.*

It might be argued that these decisions, and the earlier one to which they refer, however much opposed by opinion and practice in other jurisdictions, are sufficient precedents for holding the New Hampshire declaration of natural rights to be constitutional law, and not a mere abstract proposition ; that the declaration being substantially the same in New Hampshire and Massachusetts, and the constitution (including the bill of rights) of New Hampshire having been largely copied from that of Massachusetts, the declaration was adopted here in its Massachusetts signification ; that being a prohibition of slavery in Massachusetts, when it was adopted here, it was a prohibition of slavery here ; and that being a reservation of the right of liberty, it is a reservation of the right of property. The argument would be strengthened by the fact that New Hampshire, largely settled (though not at first) by Massachusetts people, and a part of Massachusetts nearly forty years, had, during the hundred years between their separation and the formation of their state constitutions, followed Massa-

chusetts in legislation and administration, not indeed constantly or implicitly, but frequently, and with much of the deference shown by dutiful colonists, framing their institutions upon the models of their mother country.

There are some difficulties in the way of this argument. If the national census is correct, the number of slaves in this state in 1790 was 158; in 1800, 8; in 1830, 3; in 1840, 1. Dr. Belknap, who lived in Dover from 1767 to 1787, says,—"The state of New Hampshire established their constitution in 1783; and in the first article of the declaration of rights, it is asserted that ' all men are *born* equally free and independent.' The construction there put on this clause is, that all who have been *born* since the constitution are free, but that those who were born in slavery before are not liberated by it. By reason of this construction (which, by the way, I do not intend to vindicate), the blacks in that state are in the late census distinguished into free and slaves." Letter to Judge TUCKER (written and published in Boston in 1795), 4 Mass. Hist. Coll. 204. This statement, referring to the census, corroborates its representation of slavery as an institution lawfully continuing to exist after the adoption of the constitution. The testimony of Belknap and the census tend to show that the contemporaneous construction of the bill of rights was, that the declaration of the right of personal freedom was not adopted here in its Massachusetts signification. If it had been the intention of the constitutional convention and the people by that declaration to liberate slaves, or if, after it was adopted, it had, by popular or judicial construction, been immediate, absolute, and universal emancipation, it would seem that Belknap would not have been ignorant of such intention or effect.

His silence on the actual intention of the constitutional convention and the people is significant. It is plainly to be inferred that he did not understand that the declaration was intended to have any effect upon the custom of African hereditary slavery. " The construction there put on this clause is," says he, that it liberates none but the after-born. The careful manner in which he states this subsequent construction, and withholds his approval of it, and the absence of all reference to an actual, public, anti-slavery intent (which, if it had existed, he, as a prominent and influential citizen, warmly interested in public affairs and called upon to vote for or against the adoption of the constitution, would probably have been aware of), are strong evidence of the absence of such an intent.

Still, if the declaration of the natural right of freedom was construed here to be a practical reservation of liberty for the after-born, as Belknap says it was, this contemporaneous construction would be a precedent for holding the declaration of the natural right of property to be equally effective. If, in 1783, " all men," in the New Hampshire bill of rights, did not mean all men, it meant (according to Belknap) all except slaves then born; and that exception, if it ever existed, had been extinguished by the manumission or death of the last of the slave-born, and slavery had wholly ceased to be lawful, before the adoption

of the thirteenth amendment of the constitution of the United States. 41 N. H. 553, 557. The defunct exception cannot now or hereafter exclude any one from the benefits of the reservation of the rights of life, liberty, and property. The former existence of the exception would prove the rule, and leave the reservation as operative here as it is in Massachusetts.

But the former existence of the exception may be a matter of doubt. It is not generally understood that the reservation of personal liberty was construed to emancipate the after-born of slave mothers, and not those previously born. The time when and the manner in which slavery in this state became unlawful, and ceased to exist in fact, are historical questions that have not been thoroughly investigated, and cannot be regarded as settled. There is a general dearth of knowledge and opinion on the subject. The census and Dr. Belknap's letter go to show that, in fact, legally or illegally, in some form and to some extent, slavery continued after the adoption of the constitution. Some think it was destroyed at once by the bill of rights; others, that, without any aid from that quarter, it came to its end by a gradually increasing general debility. If it continued after the adoption of the constitution, it was in a languishing condition; but its presence, in any condition, would be evidence of the contemporaneous construction of the constitutional reservation. In this state, slavery was a very infirm institution before the reservation was made. It appears to have been too mild and humane to provoke the slave or the philanthropist to litigation, and not profitable enough to be a cause of anxiety to the master: it was, in every respect, too feeble to excite public controversy, or to be a subject of much public interest. Its insignificance appears in the unknown history of its extinction. On the question whether the people of New Hampshire, when they adopted the constitutional reservation of the right of personal liberty in 1783, understood that it would abolish slavery, either instantly or gradually, very little if any direct evidence has been discovered. Of circumstantial evidence, there is a considerable amount on each side of the question. The work of the convention that framed the constitution of 1783, continued at several sessions, from June, 1781, to June, 1783. Their work was submitted to the people in 1781, 1782, and 1783, and each submission included the general declaration of natural rights. It seems probable that there was here some knowledge of the Massachusetts slavery litigation and its result, when the declaration was accepted by the people in 1783. It is not easy to understand how Gen. Sullivan and the leading public men could be wholly ignorant of what was going on in Massachusetts in relation to this subject.

A small number of slaves continued to be taxed to their masters a few years after the adoption of the constitution of 1783. In the tax-law of 1789, slaves were not one of the items of the list of taxable property. Under revolutionary influences, a considerable portion were voluntarily liberated. Some would not willingly accept a personal independence for which no preparation had been made.

If it were a matter of public history that Massachusetts, in making the reservation in her declaration of rights, intended to abolish slavery, there would be some legal ground for holding that New Hampshire intended the same thing. But, upon all the published evidence, it does not appear that Massachusetts had such an intention. Her people, for the most part, gladly acquiesced in the verdicts of juries by which slavery was abolished, and in the opinions of the judges that slavery was inconsistent with the declaration of the right of freedom; but the belief that they designed and adopted the declaration as an emancipation measure seems not to be warranted by such facts as have been made known to the public. It has been taken for granted that the actual intention "is proved by the earliest contemporaneous construction, by an unbroken series of judicial decisions, and by a uniform practice from the adoption of the constitution to the present time." *Com.* v. *Aves*, 18 Pick. 210. Slavery was abolished in Massachusetts by the verdicts of juries: the judges informed the juries that, in their opinion, slavery was inconsistent with the declaration of the right of freedom: and thereupon the inference has been drawn that the constitutional convention, when they copied that declaration and submitted it to the people, and the people when they voted to accept it, intended it should destroy the existing custom of slavery. By this plausible inference, supported perhaps by evidence that an ardent anti-slavery lawyer had claimed, when the declaration was copied or adopted, that it was inconsistent with slavery and ought to be so construed, or other evidence not sifted by a sufficient cross-examination, Belknap might easily have been misled when he wrote (in 1795), "The first article of the declaration of rights [of Massachusetts] asserts that 'all men are born free and equal.' This was inserted, not merely as a moral or political truth, but with a particular view to establish the liberation of the negroes on a general principle, and so it was understood by the people at large; but some doubted whether this was sufficient." 4 Mass. Hist. Coll. 203.

In 1774 the continental congress, not authorized and not claiming to be authorized to abolish the chattel slavery that existed in all the colonies, declared, in language that had long been common and familiar, that the inhabitants of the English colonies in North America, by the immutable laws of nature, the principles of the English constitution, and their several charters or compacts, were entitled to life, liberty, and property. Such language, when used in such a public document, was universally understood to be qualified, like the common law, in its practical application, by the exceptional custom of African slavery.

The first article of the Virginia bill of rights, adopted in convention, June 12, 1776, is,—"That all men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity, namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety."

The declaration of American independence, July 4, 1776, was a declaration of the dissolution of the political bands which had connected slaveholding colonies with the mother country, and the causes which impelled them to the separation, and not a statutory or constitutional guaranty of private rights. Among the truths, which congress in that document held to be self-evident, were these: " That all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness." This declaration had no more effect upon the American custom of holding African slaves than the declaration of 1774, because, like all such general utterances of slaveholding communities, and like the general principles of the common law, it was understood not to be applicable to that custom; and because it was a part of a declaration made for the sole purpose of substituting American for British government, and justifying that revolution, by a congress not authorized and not claiming to be authorized to abolish the American institution of slavery, or to maintain the natural private rights which they asserted in the usual aphorism. The hackneyed formula being, for these reasons, a glittering generality wholly inoperative in the most famous state paper in which it was inserted, and the peculiar reasons of its inefficiency in that document not being distinctly kept in mind, the way was opened for the unfounded and disastrous assumption that it is wholly inoperative in a bill of rights adopted by competent authority for the very purpose of reserving the rights declared, and giving them the practical security of a constitutional guaranty.

The first article of the Pennsylvania declaration of rights, adopted in convention, August 16, 1776, is, " That all men are born equally free and independent, and have certain natural, inherent, and unalienable rights, amongst which are the enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining happiness and safety."

In 1780, March 1 (the day before the draft of the Massachusetts constitution was completed in convention), Pennsylvania provided by statute for gradual emancipation, and began, by degrees, to do what she had not done, and had not intended to do by her declaration of rights. The comprehensive, natural, private rights of life, liberty, and property, affirmed and reserved in Virginia and Pennsylvania, were common-law rights. As the existing American custom of slavery was in the thirteen states a common-law exception, so it was in Virginia and Pennsylvania a constitutional exception. Whether this construction was right or wrong, the historical fact is that in those states it was the settled construction,—settled by being universally understood, accepted, and acted upon.

The first article of the declaration of rights adopted by the convention of the New Hampshire grants, in 1777, was a copy of the first article of the Pennsylvania declaration, with this addition: " Therefore no male person, born in this country, or brought from over sea, ought to be holden by law to serve any person as a servant, slave, or appren-

tice, after he arrives to the age of twenty-one years, nor female, in like manner, after she arrives to the age of eighteen years, unless they are bound by their own consent after they arrive to such age, or bound by law, for the payment of debts, damages, fines, costs, or the like.    Vt. State Papers 244; *Windsor* v. *Jacob*, 2 Tyler 192.

The first article of the Massachusetts declaration of rights of 1780, as originally copied by a committee of the constitutional convention, was,—"All men are born equally free and independent, and have certain natural, essential, and unalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing, and protecting their property: in fine, that of seeking and obtaining their safety and happiness."   This was amended by changing " equally free and independent" into " free and equal," and striking out " their" before " property."   Journal of the Convention 193, 223; 4 Works of John Adams 220; Mass. Hist. Soc. Proc., Nov., 1860, p. 92; *id.*, April, 1874, p. 302, *n.* †.

The declaration of the first and second articles of the New Hampshire bill of rights, adopted in 1783 (taking effect in 1784) and copied in 1792, was,—"All men are born equally free and independent \* \* . All men have certain natural, essential, and inherent rights; among which are the enjoying and defending life and liberty, acquiring, possessing, and protecting property, and, in a word, of seeking and obtaining happiness."

The Massachusetts convention (of 1779–1780) was composed of more than three hundred of the most estimable and distinguished men of the commonwealth.   Eleven of them were clergymen.   Statesmen and leading lawyers were there in force.   Among the delegates were Theophilus Parsons and "most of the strong men of Massachusetts, many of them second to none of her great men of that or any subsequent period of her history.   And when I name Bowdoin, its president; the Adamses, John and Samuel; John Lowell, John Pickering, George Cabot, James Sullivan, Levi Lincoln, Robert Treat Paine, Caleb Strong, and William Cushing, I shall be justified in the strong terms in which I have characterized that august assembly."   Professor Washburn, in Mass. Hist. Soc. Proc., June, 1865, p. 297.   John Hancock, Nathaniel P. Sergeant, David Sewall, and Increase Sumner were members.   Cushing, Sergeant, Sewell, Sullivan, and Sumner were judges presiding, and Lincoln, Strong, and Paine were counsel for freedom, on one or more subsequent occasions when slavery was tried by jury.   Chief Justice GRAY, in Mass. Hist. Soc. Proc., April, 1874, p. 297.   It may be safely assumed that, if the constitution did not mean emancipation in the minds of the convention, it did not mean emancipation in the minds of the people; and that, if an intention to abolish slavery by the constitution cannot be imputed to the convention without impeaching their intelligence and integrity, it cannot be accepted as an historical fact.

The bill of rights was compiled, by a committee of the leaders of the convention, almost wholly from documents with which the public men

of that day were familiar.    The whole of the Pennsylvania declaration of rights (consisting of sixteen articles largely copied from the Virginia declaration of rights), except the fifteenth article (asserting the right of emigration) and a provision of the eighth (exempting from military service those conscientiously scrupulous of bearing arms, who would pay an equivalent), was substantially copied by the committee, who also used the Virginia declaration in making their compilation. No alteration was made in the Virginia-Pennsylvania pattern that affects the present inquiry.    How can it be doubted that the first article was taken in its Virginia-Pennsylvania sense, if that sense was well established and known to the public?    And how can it be doubted, either, that its meaning was well established in Virginia and Pennsylvania, or that that meaning was known to everybody who had any knowledge of the subject?    What can be more certain than that it was understood, in Virginia and Pennsylvania, not to mean emancipation; that, in fact, it was not emancipation in those states; and that this understanding and this fact were as well known to the Massachusetts convention as to George Mason, the anti-slavery author of the Virginia declaration, or Benjamin Franklin, the anti-slavery president of the Pennsylvania convention.

John Adams, John Lowell, Theophilus Parsons, James Sullivan, Robert Treat Paine, David Sewall, Caleb Strong, and William Cushing were members of the committee.    Would such lawyers execute a design of liberating slaves, by copying a declaration that had stood for more than three years at the head of Virginia and Pennsylvania law without any such design being detected in it?    They freely copied various muniments of freemen, because they had a history.    For the same reason, they would not have relied, for a repeal of the custom of slavery, upon a copy of a slave-state paper, which, as everybody knew, had left the custom unscathed.    It is equally the habit of their profession to follow a precedent that in practice has accomplished their purpose, and not to depend on one that has been tried and found inadequate; to adopt a form that has succeeded, and not to confide in one that upon actual experiment has failed, especially when they know the failure is so complete and notorious as to raise an irresistible presumption that it would prevent the selection of that form for the achievement of their enterprise.    They would not have drawn a declaration in assumpsit after a form twice held bad on demurrer and never held good, when they knew a good one could be drawn in three words; therefore they did not trust to the Virginia-Pennsylvania declaration of rights for the liberation of slaves.    That so zealous an abolitionist as Lowell should claim that the slave-state precedent had been erroneously construed is not improbable—Moore's Additional Notes on Slavery, Hist. Magazine, Dec., 1866, New Am. Cycl., art. " Lowell," 31 Mass. Hist. Coll. 90, 10 Bancroft Hist. U. S. 365, Mr. Deane in Mass. Hist. Soc. Proc., April, 1874, p. 299 ; but that such a lawyer as he could concur in selecting it as a proclamation of emancipation, and choose needlessly to risk the triumph of his anti-slavery cause upon it,

is incredible. What member of the convention was intellectually capable of such folly? What one of their descendants was capable of it when the form of the thirteenth amendment of the national constitution was selected?

In an elaborate address to their constituents, carefully considered by the convention, and, by their direction, printed with the constitution submitted to the voters, the convention recommended the acceptance of their work, and gave the reasons upon which they founded the principal parts of the system therewith laid before the people, which appeared to them as most necessary to be explained. The professed design mentioned in the address, of establishing a government "upon the principles of a free commonwealth," as the context shows, disclosed no intent to abolish slavery. "Free state" and "free government" are in the declaration of rights. In the Virginia declaration it was asserted "That the freedom of the press is one of the great bulwarks of liberty;" that a well-regulated militia is the natural "defence of a free state;" that standing armies in time of peace are "dangerous to liberty;" and "that no free government, or the blessing of liberty, can be preserved to any people, but by a firm adherence to justice," &c. "All republics are not free. All men are born equally free. * * In every free state where the power of legislation is lodged in the hands of one or more bodies of representatives elected for that purpose, the person of every member of the state, and all the property in it, ought to be represented, because they are objects of legislation. All the members of the state are qualified to make the election, unless they have not sufficient discretion, or are so situated as to have no wills of their own. * * Slaves are of the latter class, and have no wills. But are slaves members of a free government? We feel the absurdity, and would to God the situation of America and the tempers of its inhabitants were such that the slaveholder could not be found in the land." Essex Result (written by Parsons in 1788), Life of Parsons 365, 375, 376. In the language of 1780, all the original thirteen then were, and for several years had been, free commonwealths, notwithstanding their toleration of the exceptional custom of African slavery. General terms of that kind were used by the free whites of that day, with special reference to the alleged causes and objects of the war then raging against king and parliament, and with general reference to free institutions, not necessarily excluding, but ordinarily admitting by implied exception, the established institutions of the country. Such terms did not generally signify the overthrow of that custom of African slavery (so called) which continued to be one of their own American institutions after they declared their independence, but had before that time been decided not to be English. The slave-trade was complained of; but the affirmance, in this country, of the decision in _Sommersett's case_ was not one of the objects of the American revolution.

There had been anti-slavery movements in Massachusetts; but they had been unsuccessful. There was a fear (how extensive and potent is uncertain) that the abolition of slavery there would disturb the

union and harmony of the states in the revolutionary struggle. Mass. Hist. Soc. Proc., Sept., 1868, pp. 332–334; Moore Hist. Slavery in Mass. 190, 193, 218; Poole Anti-Slavery Opinions before 1800, pp. 44, 45, n. There might also have been a fear of disaffecting some Massachusetts slaveholders, during the war that exhausted the strength of the country. Moore Hist. Slavery in Mass. 195. There were several thousand slaves in the state. Had their liberation been intended, it would for manifest and imperative reasons have been, if not advocated, at least mentioned, in the address of the convention. But the address does not allude to the subject, or to the first article of the declaration of rights. This omission, under the circumstances, seems conclusive on the question of intent. If the convention had understood that the declaration would at once liberate every slave in the state, they would (besides other comments upon it) have given the reason of their expecting it to have an effect in Massachusetts which it had not had, and which nobody expected it ever would have, in Virginia and Pennsylvania: they would have explained to an astonished people why they were content to copy a slave-state form so prominent in the history of non-emancipation, and why they disregarded the conspicuous example of the New Hampshire grants.

Mr. Bancroft says—10 Hist. U. S. 365, 366—that " the lawyers of Virginia had not considered this declaration [the first article of the declaration of rights] as of itself working the emancipation of negro slaves. To accomplish that end, the men of Massachusetts, in deciding how many of their old laws should remain in full force, excepted those parts which were 'repugnant to the rights and liberties contained in this constitution;'" and that "after deliberation and amendment, this most momentous article of all was adopted." This article—art. 6 of ch. 6 of the Mass. Const., copied into art. 90 of the N. H. Const.—was copied from the rejected constitution of 1778 without material amendment. There were similar provisions in other states. The New Jersey constitution of 1776 continued former laws in force, " such parts only excepted as are repugnant to the rights and privileges contained in this charter." The exception had not meant emancipation, in the rejected constitution of 1778 or anywhere else; and it does not appear how anybody, and particularly the legal members of the convention, could be persuaded that it would give such a meaning to any other clause. In the article reported by the committee, the laws that were to remain in force until altered or repealed by the legislature were described as all the statutes of Massachusetts, the common law, and all such parts of the English or British statutes as had been adopted, used, and approved in Massachusetts, and usually practised on in the courts of law. It is evident why, in the revolutionary war, such a proposition occasioned debate. The address shows why the convention considered the article of great importance. They say they find it necessary to continue the former laws until a future legislature shall alter them, in order to prevent anarchy and universal confusion; but not a word about the exception, which, some might think, rendered the article the most momen-

tous of all, and the most creditable, if it was emancipation, and was so understood by the convention.    To believe that they so understood any part of their work, is to accuse them of hopelessly and fraudulently conspiring to conceal their philanthropic design from their constituents, by putting forth, in a pious and prayerful address, a solemn protestation of the candor with which they had opened their sentiments to each other, and of the plainness and sincerity of their explanation.    On the question of their intent to abolish slavery by the constitution, their intelligence and integrity are proofs corroborated by a great preponderance of the other evidence.    Moore Hist. of Slavery in Mass. 200–220.

" On June 18, 1782, Jennison presented a petition to the house of representatives, ' setting forth that he was deprived of ten negro servants by a judgment of the supreme judicial court, on the following clause of the constitution, " that all men are born free and equal," and praying that, if said judgment is approved of, he may be freed from his obligations to support said negroes.' "    Mass. Hist. Soc. Proc., April, 1874, p. 297.    In this petition, Jennison respectfully represents that the clause " all men are born free and equal " has been the subject of much altercation and dispute ; that the judges have so construed it as to deprive him of a great part of his property, to which he thought his title good ; that, having been possessed of ten negro servants, most of whom were born in his family, he is now informed that, by the determination of the supreme judicial court, the said clause in the bill of rights is so to be construed as to operate to the total discharge and manumission of all negro servants whatsoever ; " what the true meaning of said clause in the constitution is, your memorialist will not undertake to say ; but, it appears to him, the operation thereof in manner aforementioned is very different from what the people apprehended at the time the same was established."    Moore Hist. Slavery in Mass. 218.    This memorial, and the debates and proceedings that arose upon or in consequence of it, must have called the attention of the legislature, and such part of the public as were aware of the agitation of the interesting subject, to the question whether the constitution was intended to be emancipation.    Jennison protested that it appeared to him the emancipating judicial construction was " very different from what the people apprehended at the time " the constitution was established.    The question of actual intent was thus raised by a complaining slaveholder, in an earnest, ceremonious, and public manner, nearly a year before the slavery litigation was ended.    There were hundreds of members of the convention, and thousands of people who voted for or against the constitution.    If emancipation had been a design of the constitution in 1780, Massachusetts would have known it in 1782 ; and such evidence of it would have been left, in writing or in print, as has not been found.    The mass of silent witnesses is evidence of great weight.    Nobody claiming that emancipation was intended, there was little occasion to assert the contrary.

Sullivan (who appears by the record to have been one of the judges present when a slave case was tried in 1781, and who resigned in

1782) says that at the trial of *Com.* v. *Jennison*, in April, 1783, " the judges and jury were of opinion that Jennison has not right to beat or imprison the negro. He was found guilty, and paid 40*s*. This decision put an end to the idea of slavery in this state." Mass. Hist. Soc. Proc., April, 1874, p. 298. Parsons says,—" The judges declared that, by virtue of the first article of the declaration of rights, slavery in this state was no more." 4 Mass. 128. " When it was generally believed that slavery was unlawful," Parsons's father (a clergyman), in the presence of his children, declared to his slaves that they were free. Life of Parsons 17, 16. In 1795, Belknap received, from various persons, written answers to inquiries respecting the introduction, progress, and abolition of slavery in Massachusetts. 4 Mass. Hist. Coll. 192. These answers, so far as they are known to be extant, show beyond all doubt that emancipation was not intended.

Judges gave to juries their opinions of the evidence, as well as their opinions of the law. *State* v. *Pike*, 49 N. H. 416, 417; *State* v. *Hodge*, 50 N. H. 520; *Wright* v. *Aldrich*, 53 N. H. 404. Juries were judges of the law as well as the evidence, in civil as well as in criminal cases. Quincy 567, 570. This mixed jurisdiction tended to greatly obscure the distinction between law and fact. Trials were held before the whole bench, or a quorum thereof; and the judges expressed their several opinions or doubts to the jury, if they chose to do so. When the opinions thus delivered were discordant, the choice of the jury was merely an exercise of their right of affirming or overruling a unanimous opinion of the court. The verdict was the final and conclusive exposition of the law. The reports of the decisions, if there had been any, should have been a record of the verdicts. The verdict, in the first or some subsequent trial of a particular case, being the end of the law for that case, and it being possible that different opinions might be entertained by different juries,—the trial of several cases, turning on a single point, might be necessary to settle a question of law. After the adoption of the constitution of 1780, the slavery question was litigated in Massachusetts, and was not immediately settled. There were several suits. Slavery obtained one verdict, but received " a mortal wound " (4 Mass. Hist. Coll. 203) two years and a half after the constitution took effect.

The notes hastily prepared by Levi Lincoln for his argument addressed to a jury at one of the trials (34 Mass. Hist. Coll. 340–344), show the character of the contest. All laws (says he) against the law of nature are void. Laws that establish slavery are against the law of nature. 1 Blac. 91–131, 423. As a custom, slavery is bad because it has not been general; it has always been disputed; it is against reason and right; it is contrary to the constitution. (On the constitutional point, Mr. Lincoln's manuscript is indefinite.) Can we expect to triumph over G. Britain, to get free ourselves until we let those go free under us ? Are we not acting as Pharoah and the Egyptians in not letting this people go ? Is not slavery a bad custom ? In the negro country it is man-stealing. Here the infant may be wrested

from its mother's breast, and sold or given away as a pig or puppy, the mother never to see it again. The master has a right to separate husband and wife, whom God has joined together and no man can put asunder. A subject of this free commonwealth may be taken from his friends, father, mother, sisters, brothers, and shipped off with spavined horses to the West Indies. This black man is our brother. We all had one common origin ; are descended from the same parents ; have one common Saviour ; die in the same manner ; the white may have his body wrapt in finer linen, and his coffin more decorated, and there all distinction of man's making ends ; we all sleep on a level in the dust ; shall all be raised by the sound of one trump ; shall be arraigned at one bar ; shall have one judge ; shall be tried by one law. This case will then be tried again. Therefore let me conjure you to give such a verdict now as will stand the test, and be approved by your own consciences in the hour of death, and by your judge at the last day. The law of God is against slavery. If there is any human law establishing slavery, you must determine which you will obey : and if you have the same ideas as I have of present and future things you will obey the former ; for the worst that can happen to you for disobeying human law is the destruction of the body ; for the other that of your souls.

This is not such an argument as would be made to a court on the unconstitutionality of slavery; and it is not such an argument as would have been made to a jury by an able legal member of the convention if it had been understood by the convention and the people, in 1780, that they were abolishing slavery by adopting the constitution. Had there been such an understanding, instead of calling upon the jury to obey the higher law, if slavery was legal, he would have appealed to the judges to bear witness as members of the convention ; he would have implored the jury not to revive and reëstablish, by their verdict, the institution which he knew, and the court and the jury and everybody knew, they had by their votes destroyed. Their own anti-slavery glory would not have been forgotten when the fate of Pharoah and the Egyptians was remembered.

It became apparent that Massachusetts juries, moved by such arguments as were sure to be made, would generally side with the slave against the master, as they had done (on questions of manumission) before the revolution. They had not a personal interest in slavery strong enough to withstand eloquent advocates appealing to humanity, justice, and religion. Tried under these conditions, slavery was condemned. It was finally settled, by the verdicts of juries, not that it was unconstitutional, but (what was much more important under such a judiciary system) that it was unpopular.

The judges expressed the opinion that slavery was inconsistent with the constitutional declaration of the natural right of liberty. Mass. Hist. Soc. Proc., April, 1874, p. 294. If they had expressed the contrary opinion, the result probably would not have been changed. It was not the first or the last time that judges, or other men, have been

brought, by investigation and reflection, to an unexpected conclusion. *Knox* v. *Lee*, 12 Wall. 457, 576; *Pierce* v. *State*, 13 N. H. 561; *State* v. *Hodge*, 50 N. H. 523; *Berry* v. *Osborn*, 28 N. II. 279, 283–286. The opinion of the Massachusetts judges may not have been a much greater surprise than the decision in *Sommersett's case*. It was not so remarkable as the progress of opinion concerning the hereditary quality of slavery. Children, born in Massachusetts of slave mothers, were in fact born slaves, and held as such. But, many years after slavery was abolished by the verdicts of juries (concurred in by the judges and the people), it was decided that by a law of 1641 such children were free, and that slavery by birth, during the last one hundred and thirty-nine years of its existence, was a violation of law. *Winchendon* v. *Hatfield*, 4 Mass. 123, 128, 129, and *note; Andover* v. *Canton*, 13 Mass. 547, 551; *Lanesborough* v. *Westfield*, 16 Mass. 74, 75; *Com.* v. *Aves*, 18 Pick. 193, 209; *Edgartown* v. *Tisbury*, 10 Cush. 408, 410; *Jackson* v. *Phillips*, 14 Allen 539, 562; Quincy 29, *n.*; Moore Hist. Slavery in Mass. 10–26; Moore Slavery in Mass., Hist. Mag., Dec., 1866.

The constitutionality of slavery depends, not upon the actual intent of the people, but upon the legal meaning of the language used by them in the constitution. The Massachusetts judges disregarded their personal knowledge of the actual intent, as they were officially bound to do. It was their duty to form an opinion by legal rules of construction; and their application of those rules gave the constitution a meaning which they knew was not intended. Its legal meaning was not to be ascertained by summoning the thousands who voted for it to testify what they understood its effect would be. Constitutional rights have a better foundation than hearsay and parol evidence. That evidence has been examined, and a portion of it presented (without reference to the question whether it is public history of which judicial notice may be taken), not as bearing on the soundness of the judicial construction accepted by the people of Massachusetts, but as having, in fact, some tendency to show how their New Hampshire neighbors probably understood the declaration of the rights of life, liberty, and property; and as affording support (legal or non-legal) to the most unfavorable view that can be taken of the efficacy of the declaration. Massachusetts may have been the only state in which the declaration was judicially held to be hostile to the previously existing custom of slavery; and there it was not intended to have any effect upon that custom. Still, it may have been adopted here, as it was interpreted by the Massachusetts court, in its literal, anti-slavery sense; or that sense may have been accepted here after the declaration was adopted. The New Hampshire slaves afterwards reported by the census may have been those who did not choose to leave the comfortable homes of their former owners; and Belknap may have been misled by the census, and by instances of uninterrupted service within his own knowledge. But take the most adverse view. Suppose New Hampshire never adopted the Massachusetts or any other emancipating construction; and suppose the declaration was never adopted anywhere as a repeal of a

previously existing custom of slavery: is the declaration, for that reason, utterly null and void?

Slavery, in its legal relations, among free institutions, was an exception. Existing originally in all the states,—in some it disappeared, in others it grew to vast dimensions. In those extensive districts where in the course of time the slave population outnumbered the free, the efficacy of general doctrines of liberty was not apparent to the popular mind. When there were millions of instances in which human beings were so far from enjoying the rights of personal liberty and ownership of property that they were property owned by others, the opinion would be likely to gain ground that those doctrines, in their general forms, were mere metaphysical speculations, incapable of being put to any practical use. It was natural for many to suppose that, if the constitutional reservation of the rights of life, liberty, and property did not mean emancipation, it meant nothing. But that conclusion is not warranted by legal rules of construction. The reservation did mean emancipation, unless, by those rules, the existing custom of slavery was an implied exception. The language of the reservation is plain and explicit. It would be difficult, says Judge SHAW (in *Com.* v. *Aves,* 18 Pick. 210), to select words more precisely adapted to the abolition of slavery. The right of enjoying and defending life and liberty, acquiring, possessing, and protecting property, is reserved for "all men,"—all members of the human family. Slaves are men: brutes owned by men are not slaves, in the ordinary sense. The reservation, applied to slaves, would liberate them. How could it be construed to be inapplicable to them? How could slavery be an implied exception?

A slave (whose liberation, by the repeated verdicts of juries, seems to have been an important part of the legal proceedings that put an end to slavery in Massachusetts) was sold, in 1754, by the name of Quaco, to Mr. Caldwell. After Mr. Caldwell's death, his widow received Quaco as a part of her share of her husband's estate. Subsequently she married Mr. Jennison, and, by the custom of England grown into common law, Quaco, being a chattel in possession, became the property of Mr. Jennison. While Mrs. Caldwell remained single, she had the legal capacity of owning a chattel in possession; but during coverture that capacity was suspended by the custom, and she was as incapable of owning Quaco as Quaco was of owning her. Her disability was not a mental one, like that of a minor or insane person, the management of whose property is entrusted (by a police regulation of custom or statute) to a guardian for the preservation of the property and the benefit of the ward and the ward's heirs. She and her heirs were deprived of her property. The legal title and beneficial interest vested in her husband, his heirs and assigns, absolutely and without any fiduciary obligation. By an ante-nuptial settlement, her title might have been transferred to a trustee for her benefit: but the disability of married women in respect to ownership could be removed only by a legislative abolition of the custom. Why was not this disability abolished by

the constitutional reservation of the right of acquiring and possessing property? Why were not married women as much entitled to the benefits of that reservation as men and unmarried women? Because the reservation was not, in fact, intended to abolish the custom universally adopted by the American people; and, in view of the custom and public history and public policy, the reservation was construed with the implied qualification that it was inapplicable to married women.

Mrs. Jennison was deprived of property by a custom transmitted by inheritance from the time when the disabilities of married women amounted virtually to slavery. Proffatt's Woman Before the Law, ch. 1; *Hammond* v. *Corbett*, 50 N. H. 501, 506. Her disability to own Quaco, and Quaco's disability to own himself, were originally parts of one system, that extinguished in a great measure the legal personality of the wife and the slave, and to the same extent aggrandized the husband and master. The disability of married women, imposed by the law of custom, was everywhere strong enough to maintain itself as an implied exception against the constitutional reservation. The custom of slavery was generally strong enough to hold its ground in the same manner. In Massachusetts, where the reservation of liberty was held to be applicable to slaves, the reservation of the right of property was not held to be applicable to free married women; and, for reasons clearly stated, it was held, by as high judicial authority as there is in this part of the world, that another constitutional provision, giving the right of voting to "every male inhabitant" having certain qualifications, did not give that right to male alien inhabitants having those qualifications—7 Mass. 524, 525, 526; and to construe the reservation of the right of acquiring and possessing property as not applicable to any person because it was construed to be inapplicable to slaves and free married women, would be as unreasonable as to hold that there is no constitutional right of voting, because, by an implied exception, that right is withheld from aliens.

Suppose the legislature should now enact that hereafter, at the instant of marriage, the husband should become the wife's chattel slave,— that his life should be at her disposal, his liberty suppressed, his property hers; and suppose the general reservation of the rights of life, liberty, and property were the only constitutional provision upon which the question of the constitutionality of the statute could be raised: it might be argued that the reservation is an abstraction; or that, marriage being voluntary, the rights lost by the husband would be a gift to the wife. It is not apprehended that there would be any serious difficulty in discovering the unsoundness of such arguments, and holding that the construction, which suffered the continuance of the customary immemorial disabilities of married women and slaves, is no precedent for the introduction of other constitutional exceptions founded on innovation and not on custom.

Custom is a great source of the common law. Indeed, the common law, properly so called, has been understood to be a mere mass of customs. What is such a custom as shall form a part of or exception

to the general consuetudinary law, has often been a difficult question. While slavery in England, in 1772, was not strong enough to be recognized by the King's Bench as a custom grown into an exceptional rule of law, it was universally recognized in this country, although in some jurisdictions it was not as strong as in England. The elements comprised in the question of its validity, and their comparative importance, are debatable subjects. The same difficulty arises in the construction of written law. There are cases which, although within the letter of a statute or constitution, cannot be considered within the intent of those who framed and adopted it. 8 N. H. 574. The intent is to be ascertained by settled rules of construction, which require the use of reason, and an observation of public history, public policy, and usage; but to what extent and in what cases is the letter to be qualified by extraneous facts? The rules of construction, being reasonable, do not confine the judgment within any narrow limits. What custom, what public policy, is sufficiently established to be judicially noticed as a legitimate ground of interpretation? By what test are we to know when the individual understanding of a people, proved by hearsay, parol, and circumstantial evidence, becomes a matter of public history of which courts take notice? The wonder is, not that there is so much conflict of authority on questions involving such considerations, but that there is so little. It is not easy to fix the bounds within which the judgment is to be exercised in determining whether a custom, usage, public policy, or historical fact, at variance with the general principles of the common law, is a legal custom, usage, policy, or fact, excepted from the operation of those general principles, and whether it is excepted from the literal and apparent meaning of the constitution. Nor is it easy to say what difference there is in the grounds on which, according to the authorities, those two questions are to be decided.

Whether the custom of slavery was a legal custom, excepted from the common-law rules that adopt and maintain the natural rights of life, liberty, and property; and whether it was excepted from the constitutional reservation of the same rights, are questions on which there has been a difference of opinion. On the common-law question, England held one way, America the other. On the constitutional question, Massachusetts was in conflict with other states. We are not now concerned to know who was right on either question; but we are concerned to know that construing the constitutional reservation to mean nothing, because it was construed, by an implied exception in favor of existing American institutions, not to abolish slavery, would be the same as holding that the action of trespass at common law is not a remedy for the infringement of the common-law right of liberty, because, by an exception, that action was not emancipation. If that action did not liberate slaves, it did and does vindicate the violated liberty of freemen. If the constitutional reservation did not break up an ancient established institution, and release those who were under the yoke; if, in that respect, it did not disturb the former condition of society,—

it did continue the former condition to the extent, at least, of securing the former right of the free to remain free. If the reservation failed to change the prior state of things, it failed, not because it was a worthless abstraction, but because it was understood to be a retention and preservation of the natural rights previously protected by the general principles of the common law, subject to certain exceptional customs that had been admitted into that law by general consent. The exceptional custom of slavery did not deprive a New Hampshire freeman of his liberty. It did not authorize the commission of that personal violence which is slavery upon such a man as the plaintiff. An attempt to make a chattel of him would be a trespass at common law; and as a freeman's right of liberty was practically maintained by the common law where the slavery exception prevailed, as well as elsewhere, so the constitutional reservation of that right is effective to the same extent, notwithstanding the same exception. If it did not abolish the exception, it was not abolished by it.

While the reservation of the rights of life, liberty, and property is unequivocal, it must be admitted that exceptional cases, within the letter of it but held not to be within its meaning, have extensively disseminated the idea that it is a transcendental theory devoid of all legal force. But it is not to be admitted as a sound legal proposition, that self-evident truths, capable of judicial application, are not legal truths when expressly declared in a bill of reserved rights, framed and adopted for the purpose of imposing effectual limitations upon the governmental powers established in the accompanying grant. It is not to be admitted that the right of acquiring and possessing property, thus reserved in the grant, is something purely rhetorical or visionary. There, if anywhere in American law, we should expect to find something practical and substantial. There we find the right of owning property,— a natural, essential, and inherent right,—universally exercised in fact, and as defensible by the operative machinery of the law as any other right. Let exceptions be sustained according to the constitutional intent ascertained by legal rules of construction. The compulsory purchase of the plaintiff's property, without compensation, is not an exception, but as plain a violation of the right as is possible. And the right should not be curtailed or obscured: the violation of it should not be extenuated, loose notions on the subject should not be propagated, by the suggestion that the constitution does not expressly guarantee the right or prohibit its violation. The right of acquiring and possessing property is reserved in the second article of the bill of rights; and robbery is a violation of that right. Whether the same right is secured by any other constitutional provision it is not necessary in this case to inquire.

II. The public took the plaintiff's property, not by the taxing or the police power, but under the pretence of exercising the power of compulsory purchase, commonly called the power of eminent domain. The public took his property without paying him for it, without giving him any legal security, without making any legal provision for his pay-

ment, and without coming under any legal obligation or liability to pay him. The wild metaphor of a purchase does not divest the act of its legal character of confiscation, nor make it anything less than a violation of his constitutional right of ownership. The seizure of his property, without payment, or legal security, or legal obligation to pay, was a transaction that lacked an element essential to the legal idea of a purchase. By the decision, payment is left to the option of the captor. The owner, deprived of all legal remedy, is deprived of his legal right.

The court are of opinion that, as a matter of fact, the public will pay him. That opinion is probably sound; but it is irrelevant. It relates to the future; the confiscation is past. The wrong was committed some time ago. The right of ownership was violated when the property was taken without any such recognition and maintenance of the right as is necessary to its legal existence; and it must remain violated forever. It may be repaired by future amends; but it cannot be retrospectively legalized by the government. The government may make reparation; it may not. It may be able; it may be unable. It may be willing; it may be unwilling. It may elect to pay the whole value, or a part, or nothing. The original legal character of the taking cannot remain in abeyance and uncertainty an indefinite length of time, waiting to be determined by the government electing whether it will pay or not.

If the government does not hereafter pay the plaintiff, it will be evident that his right is violated. How violated? and when? Not by the future non-payment, but the past taking of his property without payment, and without any legal security or legal obligation equivalent to payment as an indispensable element of a purchase. If his right would not be violated though its present situation should continue forever, it would not be violated by robbery. If it would be violated by the continuance of its present situation, when would the violation occur? How much time is to be allowed during which the past taking is to be legal, and after which it will become a trespass? The plaintiff cannot now maintain this action, because the court predict that the public will sometime introduce the element of a purchase that is as yet wanting. If that prediction is never fulfilled, what becomes of the plaintiff's right? Is a future time to be fixed, when, the present situation continuing, he will be entitled to maintain this action as his only possible remedy? The statute of limitations will not be a bar so long as the court continue to hold he has no legal remedy. If he should renew this action, or move to bring it forward after the purchase of his property remained uncompleted for fifty years, would the prophecy of payment be renewed, or retracted? How would the defendant's act be held to be a trespass, after having been once held to be no trespass? On what legal principle will his plea, good in this century, become bad in the next? If his plea is always to be good, the pretended purchase, never finished, will always be confiscation, a violation of the plaintiff's reserved right of acquiring and possessing property: and what it always will be, that it is now, and has been since the seizure was made.

The constitutional reservation of the right of proprietorship is nullified when property is taken, as the plaintiff's was, without payment, legal security, or legal obligation to pay, leaving the owner entirely helpless, at the public mercy, as he would be if his right were only a moral and not a legal one. That would be his predicament if there were no constitution and no law. That would be his predicament if the second article of the bill of rights were amended by the addition of this proviso: " but the natural, essential, and inherent right of acquiring, possessing, and protecting property, as against the public, is hereby sacrificed and extinguished." The effect of the decision is, that the plaintiff is no better off in law than he would be if the constitution, instead of reserving the private right of ownership, had expressly relinquished it to the public in these words: " Private property may be taken for public use without compensation." If the constitution had made that surrender, the public could pay the plaintiff or not as it pleased. As the constitution is now, under the decision, the public has the same option. In other words, the plaintiff's right is precisely the same, whether the constitution reserves and guarantees it, or conveys it away and authorizes its annihilation. The question being upon his constitutional right, what the constitution says on the subject is immaterial: whatever it may say, he has no rights that the public is legally bound to respect, in any property convertible to a public use. If the constitution can be thus dealt with in this case, it can be practically frittered away in all cases. If the right of property is not reserved, the whole bill of reserved rights is a schedule of a general unconditional capitulation.

Whether the reservation of the right of property is more or less necessary in a republic than in a monarchy, the judgment in *King* v. *Hampden*, 3 St. Tr. 825, 1254, placing all private property at the disposal of arbitrary power, is not an authority to be followed here. If the public can legally confiscate a part of the plaintiff's property, under the pretence of a purchase, all proprietary rights susceptible of public use are held by the uncertain tenure of an unlimited public discretion. If the plaintiff can be thus plundered, the legal rights of liberty and life are purely imaginary, for the reservation of these is no stronger than the reservation of the right of property. The plaintiff's damage, in this case, may be trifling; but the principle is despotism,—all the more dangerous because it is introduced by a subtle and insidious precedent that admits the plaintiff's constitutional right, and destroys it by a denial of legal remedy. If the public can, by a revolutionary repeal of all laws establishing tribunals of justice, defeat some of the legal remedies to which the plaintiff is entitled, his right cannot be constitutionally defeated, in this action of trespass, in this court of common-law jurisdiction charged with the duty of supporting the constitution. If the constitution furnishes him with no legal means of compelling the public to provide the protection of life, liberty, and property required by article 12 of the bill of rights, or the certain and complete remedy required by article 14, it furnishes the public with no

legal means of obtaining a sound judicial decision establishing the constitutionality of the public destruction of rights constitutionally entitled to the public protection. The abolition of judicial proceedings would not deprive him of all his legal remedies. He would still have the constitutional right of "protecting property." In the exercise of that right, he can legally defend his property by force until it is constitutionally taken. If the public should overcome him, and levy war against the constitution by taking his property, under pretence of a compulsory purchase, without conforming to the legal requirements of such a purchase, his right would not be legally affected by his physical inability to quell the insurrection.

The claim of the defendant, sustained by the decision in this case, is, that the plaintiff, despoiled of his property, is left in the undisturbed possession and enjoyment of his constitutional right without any legal remedy. That claim, under existing circumstances, is an obscure form of the proposition that the plaintiff's moral and natural right is not a legal one. In a time of peace, when courts of common law and equity jurisdiction are open, and the course of justice and the administration of the law are unobstructed, the reserved right of ownership, without a legal remedy for the violation of it, is a contradictory expression. The ordinary idea of a legal right is the idea of something capable of being legally protected and enforced by process of law or privilege of nature. And this case is no exception to the general rule, that the legal character of a right is something more than a hope or faith that the right, incapable of being maintained by the proprietor, either with or without process of law, will be respected by those who can violate it with impunity. Legal process, executed by the sheriff and the whole force of the state, is a legal remedy, although it may be a worthless one by reason of the inability of the defendant to satisfy the judgment. By such a process, the plaintiff is entitled to recover, not the value of property constitutionally purchased by the public, but damages for property unconstitutionally seized by the defendant. *Fisher* v. *McGirr*, 1 Gray 1, 45–48; *B. & L. R. Co.* v. *S. & L. R. Co.*, 2 Gray 1, 37.

The reserved right of ownership is a moral right sustained by moral remedies operating on the public conscience, and the consciences of public agents and servants. It is also a legal right sustained by legal remedies operating in a different manner. When the public makes a constitutional compulsory purchase of property, it commits no wrong: the owner's reserved qualified right is preserved intact, and requires no remedy. *P. Bridge* v. *N. H. Bridge*, 7 N. H. 35, 71. Such a purchase is an exercise of the granted limited power of so taking the property as not to infringe the owner's right. Such a right is a legal right, in the largest and strongest sense: it is constitutionally supreme. The gist of the constitutional reservation is, that the legal protection of the owner's paramount right is a limitation of the public power of taking his property,—a condition upon which the power is granted. In this case, the power has not been exercised because the condition has not been complied with.

" A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of" eminent domain. " The settled and fundamental doctrine is, that government has no right to take private property for public purposes without giving a just compensation ; and it seems to be necessarily implied that the indemnity should, in cases which will admit of it, be previously and equitably ascertained, and be ready for reception concurrently, in point of time, with the actual exercise of the right of eminent domain." 2 Kent. Com. 339, and note *f*; 1 Redf. on Railw., sec. 73 ; Sedg. on St. & Const. Law 465, *n.*, 2d ed. The rule laid down by Kent is an effect produced by the constitutional reservation of the right of property. The reserved right is the owner's natural right qualified by the public legal necessities, that is, by the necessary consequences of an exercise of the powers granted to the public. When there is a necessity for taking private property for public use (not by taxation or police regulation), there can be no unnecessary encroachment upon the natural right. There was no legal necessity for taking the plaintiff's property without a purchase. The owner of property required for public use may be compelled to sell it ; and the compulsory character of the sale is the only necessary and therefore the only constitutional modification of his natural right. He cannot be unnecessarily compelled to give credit ; and when he is necessarily compelled to part with his property without payment, there can be no necessity for compelling him to wait for payment without legal security. The compulsory sale is for cash, unless some insuperable, legal obstacle requires it to be on credit. If the owner is known, but cannot be found, his money may be put in a reputable savings bank, or otherwise judiciously deposited or invested for him in such a manner that it can fairly be said that his constitutional right of owning the property taken has been respected, and that the property has been purchased and paid for with all the essential requisites of a compulsory sale and payment that the case admits of. If the value cannot be ascertained until the property is taken, if the title is in dispute or doubt, or if any other obstacle of a like legal character intervene, the owner is entitled to payment as soon as such obstacles can be removed ; and until payment is made he is entitled to legal security.

There can be no necessity for casting upon him the burden of any legal proceedings. Legal proceedings may be necessary, and he may be entitled to notice if he can be found ; but, so far as such proceedings are necessary for his enjoyment of his constitutional right, they are to be instituted and carried on by the public, because the public power is limited by his reserved right. His property is taken without payment, if it is taken with the payment of a sum procurable only by his unremunerated outlay of an equal or greater amount. And whether he must lose a sum equal to, or greater, or less than his compensation, the principle is the same. Compensation is to be made " without imposing on the owner any burden of seeking or pursuing any remedy, or leaving him exposed to any risk or expense in obtaining it." *Bonaparte* v. *C. & A. R. R. Co.*, Bald. 205, 227. If payment, legally prac-

ticable when the property is taken, is not then made ; if payment, not legally practicable at that time, is not made as soon afterwards as legal obstacles can be removed ; if, during the time of necessary credit, payment is not legally secure ; or if, in order to obtain payment or security, he must incur expense that will diminish the amount of compensation to which he is entitled,—his natural right is unnecessarily invaded, and his constitutional right, which is his natural right qualified by nothing but legal necessity, is violated.

It is said that, when property is taken by eminent domain, the owner is entitled to compensation ; and this statement of the law is unobjectionable if it means that the public is not entitled to take his property without maintaining as much of his natural right of ownership as is consistent with a necessary appropriation of certain property to the public use. There is reason to fear that the usual statement of the right of compensation is not always understood in that sense. It sometimes appears to convey the idea that the owner's right is not infringed, if, in fact, at sometime he be paid. But this falls far short of the true doctrine. The constitutional requirement is not satisfied by payment without regard to time. The constitutional right is, not a right of payment, but a right of ownership ; and that right is violated when, as in the present case, the time of payment is left to the discretion of the public.

The question here is not whether the public, having legally taken the plaintiff's property, was, is, or will be able and willing to pay him. Past, present, and future ability and willingness are immaterial. The question is, whether his property was legally taken. Admitting all the allegations of the plea to be true, it does not show a legal taking, because, first, it does not appear that, when his property was taken, a legally authorized compensation was made, tendered, or waived, or was legally impracticable ; secondly, it does not appear that, compensation being then impracticable, any legal security was given, offered, or waived. Legal security is nothing more than what is feasible, such as the proprietor can legally avail himself of with facility, as soon as payment is legally practicable, and such as in all respects appears to be ample. In fixing the sum to be secured, an exact assessment of damages is not necessary. The constitution does not require an impossible nor a legally difficult thing to be done. It does not require compensation to be made before the amount of it can be ascertained, nor require it to be secured in an impracticable manner. But it reserves the right of owning property : that right requires compensation : and compensation, if it cannot be made when the property is taken, requires security to be given ; for, otherwise, compensation may never be made. The reserved right of ownership is not reserved, in a legal sense, if property can be taken from its owner, by eminent domain, before compensation is made or legal security is given. Property, forcibly taken before compensation made or security given, is taken without compensation, without security, and without that observance of the reserved right to which the public power is subject.

Any irrevocable deposit—*Gilmer* v. *Lime Point*, 18 Cal. 229—appropriation, or disposition of money, any indemnifying obligation incurred or provision made, that affords the proprietor legal security (for payment and for the necessary expense of obtaining it), convertible into compensation at his option, as good as is legally practicable under the circumstances, is reasonable legal security. It is legally sufficient in amount, if, upon such evidence as is available, it appears to be sufficient for his indemnity, and is subject to subsequent increase or diminution upon its being made to appear that it is unreasonably small or large. A sum of money, so deposited that he can legally avail himself of it, is security of a legal character. It may be stolen, or embezzled, or lost by fire or flood. Absolute certainty of security is impossible; but that is no reason for holding that he is not entitled to security. Reasonable legal security is security capable of legally ensuring his compensation with reasonable legal certainty, at his option, and not merely with reasonable moral certainty, at the option of the public by whom or by whose authority his property is taken. That he is entitled to; for if his property can be legally taken without that, it can be legally taken without compensation.

The question of security does not arise in this case, because the fact does not appear from the allegations of the plea (admitted by the demurrer to be true), nor from anything within the official cognizance of the court, that payment was legally impracticable when the property was taken. If that fact appeared, the plea would still be bad, because it does not appear that legal security was given. In the first place, if the plaintiff should institute proceedings under the statute, obtain an assessment of his damages, and press his claim at Washington, there is no moral certainty that the government would pay all his reasonable costs and expenses; and, without a full payment of them, his natural right of owning the property taken would be unnecessarily invaded, and his constitutional right infringed. In the second place, we cannot officially know that he is able to incur such costs and expenses. The reservation of the right of property protects all proprietors, not excepting those who are unable to protect themselves. Property cannot be compulsorily purchased by the public without everything being done by the public that is necessary to complete the purchase. The proprietor can be compelled to submit to the purchase, but he cannot be compelled to do anything. If he cannot or will not move or speak, the purchase must be completed without his moving or speaking,—that is, whatever is legally practicable must be done by the purchaser.

In the third place, the moral certainty that the government will, for some time, be able and willing to pay the plaintiff something, is not security of that legal kind which is indispensable to his legal right of property. If there were a moral certainty of his full payment, and if it were, in fact, vastly better than any legal security that would be required or any that could be given, it would not alter the legal aspect of the case. The defect in such a certainty is, it is not a legal one; and, however inferior a legal one may be to the other, it is a legal one

that the plaintiff is entitled to.  If he is unwise and unreasonable in insisting upon his legal right, it is his constitutional privilege to be unwise and unreasonable to that extent.  His reserved right of property is not coupled with the condition that he shall rely, for its protection, on the moral and financial soundness of the government, or that he shall be content with a judicial prophecy on the subject.  The decision, leaving payment to the option of the purchaser, and removing the plaintiff's constitutional right from its legal foundation to a moral one, is a denial of legal justice, the place of which no moral remedy can legally supply.  The legal character of his right is destroyed by the confidence of the court in the integrity and solvency of the public. A judicial opinion, that the reservation of the right of property is wholly unnecessary because the government will never commit or permit any violation of it, or that it is unnecessary in such cases as this, is immaterial.  Had the people of New Hampshire been of that opinion, they might have omitted the reservation, or have excepted such cases as this from its operation.

The public has the constitutional power of making a compulsory purchase of property for a necessary public use.  A statute can easily be drawn, giving to certain public agents a general authority to do everything necessary for such a purchase, and particularly providing for compensation, and a determination of the value of the property in a summary proceeding, instituted and carried on by the public, before a tribunal convenable at a convenient time and place.  A jury trial is not necessary.  *Baker* v. *Holderness*, 26 N. H. 110, 114; *Pet. M. W. R. Co.*, 35 N. H. 134, 142–145; *Work* v. *State*, 2 Ohio St. 296; *People* v. *Smith*, 21 N. Y. 595; 1 Bl. Com. 139, Sharswood's *note;* 2 Kent Com. 339, note *e;* Sedg. Const. & St. Law, 2d ed., 464, *n.*, 470, 490, *n.*; Cooley Const. Lim. 563.  Cases in which the amount and value of the property cannot be ascertained with sufficient accuracy before it is taken, or in which payment is otherwise delayed by a legal necessity, the same statute can provide for by authorizing such security to be given as is shown to be reasonable by available evidence in the same proceeding before the same tribunal.  There is no apparent difficulty in providing, by statute, a procedure, simple in form, and speedy, easy, and flexible in operation, by which the public can enjoy its right of taking property for the coast survey, without impairing the owner's enjoyment of his right of acquiring and possessing property.  If there is any such statute applicable to property in New Hampshire, it has not been cited in this case, unless the chapter on which the defendant relies is construed, as the plaintiff claims it should be, to require payment or tender in advance.

If, in the absence of necessary statutory provisions for security and compensation, a good plea cannot be drawn in this case, future cases can be provided for by legislation.  If the public has not yet supplied itself with a constitutional method of exercising its power of compulsory purchase upon the plaintiff's land for the purposes of the coast survey, that is not his misfortune.  If no process could be devised that

would, in every case, be sufficiently expeditious for those purposes, then, so far as that survey required property to be taken with more speed than any constitutional process is capable of, its purposes could not be carried out. But in view of the rapid processes that have been contrived for other objects, there would seem to be no reason to apprehend an obstruction of that survey by a slow process, until a well-directed effort to provide a swift one has been unsuccessful.

"There has been a serious difference of opinion respecting the requirements and construction of those constitutional provisions which declare, in the same or similar terms, that ' private property shall not be taken for public uses without just compensation.' How far legislation may proceed to authorize acts to be done without first making or tendering compensation, and where it becomes arrested by the provision, has been considered by many of the ablest men and most distinguished jurists of the country. And yet there is an indication, arising out of the conflict of opinion, and the difficulty of reconciling the positions attempted to be established with each other, and with any sound and pervading principle, that the whole truth has not been reached." SHEPLEY, C. J., in *Cushman* v. *Smith*, 34 Me. 247, 253, 254. It is plainly the opinion of the supreme court of the United States that constitutional provisions, in terms prohibiting the taking of private property for public use without compensation, have, in some cases, by erroneous constructions, been turned away from the intended protection of private rights, misemployed in the invasion of those rights, and perverted into instruments of oppression. *Pumpelly* v. *G. B. Co.*, 13 Wall. 166, 177, 178, 179, 181.

Much unsound doctrine has prevailed in relation to what is a taking of property, what is a public use, and what is a constitutional provision for compensation. The prohibition has been extensively interpreted and applied as if it were a license for the judicial encouragement of public works and industrial enterprises, and not a bulwark between the power of the many and the rights of the few. So unsatisfactory has been the administration of this branch of the law, that in some states constitutional provisions have been adopted expressly requiring the compensation to precede the taking,—an exaction that ought not to have been necessary, and must in many cases (if correctly construed) be an extremely embarrassing and injudicious restriction of eminent domain. Loose ideas of the whole subject have been entertained. The law has been held, in the absence of the prohibition, as if it were present (*State* v. *Dawson*, 3 Hill (S. C). 100, being an exception), and in its presence as if it were absent, without a distinct recognition of fundamental principles, broad, deep, and solid enough for the settlement of great questions of private right and public power. This part of American constitutional law has been rendered important by the magnitude of public improvements : its defects are largely due to tottering foundations, inconsiderately laid when those improvements were begun.

Much confusion has been introduced by dominant authorities erro-

neously holding compensation to be necessary, or putting the necessity of it on untenable ground. New Hampshire is not the only state in which the constitutional view has been darkened by doctrines of natural justice, and theories of the highest law. The decision of Chancellor KENT, in the leading case of *Gardner* v. *Newburgh*, 2 Johns. Ch. 162 (in 1816), deriving a constitutional requirement of compensation from other sources than the constitution, has had an unfortunate effect. It is one of the principal causes of the present deranged condition of the law of compensation. Until 1822 the constitution of New York contained no reservation of the right of property, no express prohibition of the taking of private property for the public use without compensation, and no provision that was understood to require compensation. It established "the supreme legislative power." In that state of things, Chancellor KENT deduced the duty of compensation as a necessary qualification accompanying the exercise of New York legislative power, from the fact that the limitation is admitted by the soundest authorities (citing Grotius, Puffendorf, Bynkershoeck, and Blackstone), and is adopted by all temperate and civilized governments from a deep and universal sense of its justice ; from requirements of compensation in the constitutions of Pennsylvania, Delaware, Ohio, France, and the United States ; and from the first principles of government. "It is a principle in the English law, that an act of parliament, delivered in clear and intelligible terms, cannot be questioned or its authority controlled in any court of justice. 'It is,' says Sir William Blackstone, 'the exercise of the highest authority that the kingdom acknowledges upon earth.' * * The will of the [English] legislature is the supreme law of the land, and demands perfect obedience. But, while we admit this conclusion of the English law, we cannot but admire the intrepidity and powerful sense of justice which led Lord COKE, when chief justice of the K. B., to declare, as he did in *Doctor Bonham's case*, that the common law doth control acts of parliament, and adjudges them void when against common right and reason. * * If there be no constitutional objection to a statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power, under any other form of government." 1 Kent. Com. 447, 448. The rule in *Gardner* v. *Newburgh* originated in such an intrepidity and powerful sense of justice as KENT supposed Lord COKE was led by in *Dr. Bonham's case.*

The legislative power of New York was thus restricted by a duty of compensation, imposed not by a judicial interpretation of any particular passage of the constitution, not by any reasoning tending to show that "the supreme legislative power" was not to be understood in its English sense—*Fletcher* v. *Peck*, 6 Cranch 87, 135, 136, *Terrett* v. *Taylor*, 9 Cranch 43, 50, 51, *Wilkinson* v. *Leland*, 2 Pet. 627, 657—but by a judicial usurping administration of the higher law of natural justice. The duty of compensation was defined by the arbitrary discretion of the court undertaking to see that justice, of an irregular, non-legal sort, was so done in each case as to promote the popular demand for works of internal im-

provement. "If there ever was a case, in the ordinary pacific operations of government, in which all petty private interests should be made subservient to the interest of an entire people, this is one. The canals were undertaken ' in full confidence that the congress of the United States, and the states equally interested with this state in the commencement, prosecution, and completion of these important works, would contribute their full proportion of the expense.' We have not as yet realized the fruits of that confidence, and we are left to bear singly the whole expense, as well as to enjoy all the honour and glory of this stupendous undertaking. We have advanced too far to recede. The entire plan must and will be completed. All little impediments must be surmounted. * * If the act we are examining has omitted to make any provision for the assessment and payment of damages for such temporary use, it may have escaped the attention of the legislature, or the case may have been deemed, at the time, immaterial and unimportant. The omission, however, if it be one, does not prevent the right of the commissioners to enter and use the land." Chancellor KENT, in *Jerome* v. *Ross,* 7 Johns. Ch. 315, 342, 343, 344. This particular error of *Jerome* v. *Ross,* repeated in *Wheelock* v. *Young,* 4 Wend. 647, was corrected in the leading case of *Bloodgood* v. *M. & H. R. R. Co.,* 18 Wend. 9, 17, 27, 38, 75. But the general doctrine of *Gardner* v. *Newburgh,* that the subject of compensation is within an indefinite judicial discretion, was not overruled in *Bloodgood* v. *M. & H. R. R. Co.* It continued to prevail in New York after a constitutional prohibition of the taking of private property for public use, without compensation, was adopted. Mr. Van Buren was of opinion that the prohibition was unnecessary (Proceedings of the New York Convention of 1821, p. 649) : and the interpretation put upon it seems to show a general concurrence in his opinion.

The prohibition has apparently had no effect, because it has been understood to be merely declaratory of the discretionary doctrine of *Gardner* v. *Newburgh.* In *Bradshaw* v. *Rodgers,* 20 Johns. 103, 106, it was held that the prohibition is " declaratory of a great and fundamental principle of government ; and any law violating that principle must be deemed a nullity, as it is against natural right and justice." Certainly the prohibition is declaratory of the higher natural moral law of justice : but it is not such a declaration of that law as confers upon the court a general authority to administer justice according to its discretion in each case, and to disarm and disable the prohibition by divesting it of its legal character, depriving those whose property is taken of all legal remedy, and leaving them to the moral remedy which they have under the moral law. The constitutional declaration of the moral and natural right of property (whether expressed in the form of a declaration or a prohibition) adds something to that right, to wit, a legal character and a legal remedy ; and that character and that remedy are destroyed, the declaration is annulled, as much as it adds is deducted, when (as in the present case) a moral certainty of compensation is held to be sufficient, and a legal certainty is held to be unnecessary.

The discretionary theory of Chancellor KENT has been inadvertently followed instead of the legal theory of the constitution. The general discretionary tone of American authority on this subject comes from New York, where the distinction between the discretionary theory and the constitutional principle was not observed. The question of law being decided as a question of fact within the discretion of the court (*Bundy* v. *Hyde*, 50 N. H. 116, 120; *Darling* v. *Westmoreland*, 52 N. H. 401, 408), the natural consequences have ensued. Moral suasion is substituted for legal force; moral probability takes the place of legal security; faith in the public conscience and the public treasury supersedes legal remedies; the right of owning property dwindles into a right to beg for compensation; the constitutional reservation is abolished by a presumption that the public will not violate it.

"There are many cases in which the rights of property must be made subservient to the public welfare. The maxim of the law is, that a private mischief is to be endured rather than a public inconvenience. On this ground rest the rights of public necessity. *  * The right of eminent domain, or inherent sovereign power, gives to the legislature the control of private property for public uses. *  * And yet even here the constitution of the United States, and of most of the states of the Union, have imposed a great and valuable check upon the exercise of legislative power, by declaring that private property should not be taken for public use without just compensation. A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property without his consent; and this principle in American constitutional jurisprudence is founded in natural equity, and is laid down by jurists as an acknowledged principle of universal law." 2 Kent Com. 338, 339. "A provision for compensation is an indispensable attendant on the due and constitutional exercise of the power of depriving an individual of his property," was the language previously used by the Chancellor in *Gardner* v. *Newburgh*. The confusing and misleading tendency of his commentaries on this subject is increased by the prominence of civil-law writers, and *Gardner* v. *Newburgh* among the authorities which he cites. He derives the legislative power of eminent domain, not from a specific, American, constitutional grant, but from public convenience, necessity, or inherent sovereignty. He does not show how the constitutional adoption of the doctrine of *Gardner* v. *Newburgh* has been a great and valuable check in New York or elsewhere. He does not specify any effect produced, in practice, by such adoption, upon the acknowledged principle of universal law, applied by an absolute discretion, as it was in that case.

In the leading case of *Bonaparte* v. *C. & A. R. R. Co.*, Bald. 205, 220, 221, 226, it was held (in 1830) that eminent domain is a power of all governments, an incident of the sovereignty of every government; that the obligation of payment attaches to the exercise of the power, though it is not provided for by the state constitution; that the inherent power of appropriating property to the public use carries with

it the obligation to make compensation; that the right of every government to take private property for public use, and the obligation to make just compensation, are concomitant.

"The right to take private property for public use does not depend on constitutional provisions, but is one of the attributes of sovereign power.   *   *   This power to take private property reaches back of all constitutional provisions; and it seems to have been considered a settled principle of universal law, that the right to compensation is an incident to the exercise of that power; that the one is so inseparably connected with the other, that they may be said to exist, not as separate and distinct principles, but as parts of one and the same principle." DAYTON, J., in *Sinnickson* v. *Johnson*, 2 Harrison 129, 145; *Ten Eyck* v. *D. & R. C. Co.*, 3 Harrison 200, 202, 203; *Coster* v. *T. W. Co.*, 3 C. E. Green 54, 63; *T. W. C. Co.* v. *Archer*, 9 G. & J. 479, 482, 483; *Cooper* v. *Williams*, 4 Hammond 253; *Harding* v. *Goodlett*, 3 Yerg. 41, 51, 52; *Dist. of Pittsburgh*, 2 W. & S. 320, 323; *Hooker* v. *N. H. & N. Co.*, 14 Conn. 146, 152, 153; *Gilmer* v. *Lime Point*, 18 Cal. 229, 250, 251.

In a form of government, constitutional in the American sense, public authority is exercised under a power of attorney; the powers of government are created and conveyed to the public by an instrument in writing duly executed by the voting class or their elected and authorized agents; the power of eminent domain does not exist unless it is so created and conveyed.   Coupled with a reservation of the right of property, eminent domain is limited every way by the law of necessity; but it can no more be judicially extracted from a non-constitutional public necessity, inherent sovereignty, or feudal resumption, than from the divine right of kings.   Established in error by early American authorities, it was held in check by a duty of compensation drawn from the civil law, the natural law, the universal law, and any law higher or lower than the constitution.   The constitutional disposition of the whole matter has been perverted into such a declaration of *Gardner* v. *Newburgh* as leaves the law what it would have been if that case had been judicially and not constitutionally affirmed.   When the expansion of public works and internal improvements began to raise this class of questions, the ground of clear constitutional principle was not taken and held.   And now the plaintiff's constitutional right of property, destitute of legal character and legal protection, has come to rest on the general faith of the court in the material prosperity of the country and the moral government of the universe.

This result has been reached by several steps.   At the outset, *Gardner* v. *Newburgh* was accepted as a correct exposition of constitutional law.   The right of property was subjected to an inherent public sovereignty, with no other security than the general and shifting notions of convenience and justice entertained by the courts.   The first of these notions required prepayment in all cases.   *Gardner* v. *Newburgh*, 2 Johns. Ch. 162, 166.   The next referred the proprietor to the future justice of the legislature.   *Jerome* v. *Ross*, 7 Johns. Ch. 315, 344.   This being renounced, it was held that there must be either prepayment,

or a legal remedy whereby the proprietor could coerce payment by process of law in a judicial tribunal. *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 9, 17, 18, 38; *Lyon* v. *Jerome*, 26 Wend. 485, 493; *People* v. *Hayden*, 6 Hill 359, 360, 361; *Rexford* v. *Knight*, 11 N. Y. 308, 314; *Ash* v. *Cummings*, 50 N. H. 591, 613, 621; *Eaton* v. *R. R.*, 51 N. H. 504, 517, 518; Cooley Const. Lim. 560; Sedg. St. & Const. Law 463–468. In Massachusetts this position was abandoned; and it was held that, if a statute provided for payment to be made out of a public fund, the proprietor was not entitled to prepayment or legal process. *Talbot* v. *Hudson*, 16 Gray 417, 431, 432. And finally, in this case, the plaintiff, without payment, without any legal process by which he can enforce payment, and without any statutory provision requiring anybody to pay him, finds every vestige of his legal right swept away by the revival of the doctrine of *Jerome* v. *Ross*, that was exploded thirty-seven years ago.

The requirement of prepayment, in *Gardner* v. *Newburgh;* the requirement of nothing, in *Jerome* v. *Ross;* the acceptance, in *Bloodgood M. & H. R. R. Co.*, of a remedy by legal process upon an adequate fund, although the compensation might be less than the expense of obtaining it; the defeat of legal process, in cases in which it was supposed to be effectual—*Supervisors* v. *U. S.*, 18 Wall. 71, *Rees* v. *Watertown*, 19 Wall. 107, *Heine* v. *L. Coms.*, 19 Wall. 655; the acceptance, in *Talbot* v. *Hudson*, of a statutory provision, without payment or legal process; and the return, in this case, to the overruled decision of *Jerome* v. *Ross*,—are instances of the practical operation of the discretionary theory. Through such vicissitudes the right of property passes, repeatedly settled and unsettled by what a court happens to think is expedient and safe in fact, instead of being permanently established on a uniform principle of constitutional law. Stripped of every legal means of defence and of every element of a legal right, and handed over to the mercy of unlimited public power, it now experiences, a second time, the lowest fortune of its extra constitutional career.

The discretionary theory is purely arbitrary and non-legal. Its unprincipled character is manifest in special anomalies and incongruiti s, as well as in the general decline and fall of the right of property effected by its application. It maintains a distinction, that does not exist in law or fact, between the purse of a nation, state, county, city, town, sc ool district, or any municipal part of the public, and the purse of other corporations and individuals. *Cushman* v. *Smith*, 34 Me. 247, 256, 257. It holds the former to be an adequate and the latter an inadequate fund, without any inquiry into the fact. *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 9, 18, 28, 74; *Walther* v. *Warner*, 25 Mo. 277; Cooley Const. Lim. 560, 561, 562; *Ash* v. *Cummings*, 50 N. H. 591, 621. In assuming that municipalities are always responsible and always honest, and that nobody else can be safely trusted, it avers what everybody knows is not true. It asserts a moral certainty of voluntary payment in the municipal class of cases, and denies it in every

other class, in entire disregard of all grounds of moral assurance. Professing to reject the technical view and the legal certainty of constitutional rights, and to introduce the high moral authority of reason and justice, it starts with the municipal distinction, a technicality and fiction that shuts out reason and justice, and excludes the merits and equities of the case from consideration. Claiming to found the distinction upon historical fact, it ignores the painful circumstances of the disbandment of the American army in 1783, the deplorable condition of the finances at that time and afterwards, and the numerous federal, state, and municipal bankruptcies and repudiations (some of them not recorded in judicial decisions because t e debtors were not suable) that are conspicuous in our annals.

In 1790 the Pennsylvania constitutional reservation of the right of acquiring, possessing, and protecting property was unnecessarily supplemented by an amendment prohibiting the taking of private property for public use without compensation. The reservation and the prohibition were so invalidated by the operation of the discretionary theory, that in 1838 it became necessary to add another amendment requiring compensation to be made or adequate security to be given before property is taken for a public use by a corporate body or individual. Under this amendment, controlled by the discretionary theory, it is held that the municipal power of taxation is ordinarily adequate security to the citizen for his property taken for a public use; but, if it is clearly shown that the power of taxation is inadequate to pay him within a reasonable time, the court will interfere, when properly called upon, and prevent the property being taken until adequate security is given. *Keene* v. *Bristol,* 26 Pa. St. 46 ; *Long* v. *Fuller,* 68 Pa. St. 170 ; *Dist. of Pittsburgh,* 2 W. & S. 320, 325 ; *Harrisburg* v. *Crangle,* 3 W. & S. 460 ; *Yost's Report,* 17 Pa. St. 524, 531 ; *McClinton* v. *R. Co.,* 66 Pa. St. 404, 408. The proprietor has the burden of clearly proving that the municipality will be unable to pay him within a reasonable time. His right of property depends upon his ability to show a municipal inability that may be peculiarly within the knowledge of persons interested to conceal it from him. He must also be allowed to show a municipal unwillingness that might be as fatal to his right as municipal indigence. If he happens to be a poor man, his right of property is reduced to the privilege of being ruined by litigation. If he happens to be a rich man, his wealth cannot avert the ruin of his constitutional right.

Suppose the plaintiff, in this case, should now file a replication alleging the insolvency of the government, or some other impediment in the public service, or a taking of the whole or a part of his compensation from him in advance by the expense of obtaining it: if such a replication were held good, the defendant would be exempted from the rule that requires a complete justification of his entry to be pleaded and proved by him; and there would be a strange issue to be tried by the court or the jury. Is the question, trespass or no trespass, to depend upon the result reached by any tribunal on evidence of the public accounts, the public credit, the public morals, the prospects of the

revenue, the chances of disunion or war, the magnanimity of the government, the present or prospective character of public servants, the fees of claim agents, or the power of the lobby ? If such a replication were held bad, what would become of the constitutional right of owning property taken without compensation, and the discretionary theory finding a moral certainty of payment in an arbitrary presumption which the plaintiff offered to refute ? Between the nation whose solvency is presumed, and the states and municipalities whose bankruptcy is notorious, where is a legal line to be drawn at which such a replication will begin to be good ?

"The elementary principle, that the sovereign can do no wrong, is the foundation on which rests the rule, recognized in our jurisprudence, by which the state is exempted from being subject to process at the suit of a creditor. The presumption of law is, that the state will keep its faith inviolate, and honestly fulfil all its obligations." *Talbot* v. *Hudson*, 16 Gray 417, 432. A voluntary creditor of one of the states or of the nation has no legal cause to complain of a failure of the presumption which he has accepted. But with a conscript creditor the case is very different. If the exemption of an American government from legal process is affected by an adoption of the monarchical fiction that the king can do no wrong (Broom L. Max. 40), that fiction shows how flagrantly the reserved right of property is violated when property is compulsorily purchased by the government, without prepayment and without legal security. The express reservation is not rendered nugatory by the implied fiction. On the contrary, the whole bill of reserved rights was adopted because credence was given to the testimony of the great charter, the petition of right, the English bill of rights, the declaration of independence, the preambles of many of the first American constitutions, and the testimony of all history, that government not only can do wrong, but is exceedingly apt to do wrong ; and it was deemed prudent, in the American experiment of free institutions, to reserve certain private rights which the government should have no authority to infringe. The public cannot, by any legal proceedings, be compelled to pay the plaintiff for his property which the public has forcibly converted to its own use. Under this public immunity, his reserved right of property plainly required payment to be made, or legal security to be given, when his property was taken. Compelling him to give credit without legal security or legal remedy, was a confiscation of his property, and a destruction of the legal character of his right. Legal principle, as well as propriety of language, is set at naught when that is called a legal right of property which may be legally taken from the proprietor by force, with or without payment, according to the available means of the spoiler. The claim of the defendant, in this case, is, that the plaintiff's compensation depends not only upon the public means, but also upon the public pleasure : and that claim is upheld by the decision.

Even if prepayment or legal security were not necessary to the right of property, when eminent domain is exercised, the result in this case

would be the same. The plea is bad whether it be tried by principle or precedent. It is settled by the authorities that there must be a provision for compensation; that the proprietor's right is violated when he is compelled, as the plaintiff is, to trust to the future justice of the legislature. "No money shall be drawn from the treasury but in consequence of appropriations made by law." U. S. Const., art. 1, sec. 9; *Reeside* v. *Walker*, 11 How. 272, 291. We may take notice of acts of congress appropriating money for the coast survey; but we do not know that the money appropriated for that survey had not been expended when the plaintiff's property was taken. It is not alleged in the plea, or claimed in argument, that any money was specially appropriated or reserved for his payment. If there was money in the public treasury, or elsewhere, appropriated for the coast survey, which the public agents could have paid to him, and if such a fact would be a defence, it does not make the plea good, because it is not alleged in the plea. How the fact that there was some public money somewhere, which the public agents might have paid to the plaintiff if they had seen fit, but which they were under no obligation to pay to him, and which they might have legally paid, and, if there was any, undoubtedly have paid to other persons,—how such a fact would be his payment, or be equivalent to his payment, or give the character of a purchase to the seizure of his property, might have been a subject of inquiry if such a fact had been alleged in the plea.

An entry upon and a temporary use of private property, by the public, for a preliminary survey, without compensation, are justified by the authorities. Whether there is any limit of the uncompensated damage that may be done by preparatory steps of that kind; what the limit is, if there is any; and whether such entry and use are an exercise of the police power—*Winslow* v. *Gifford*, 6 Cush. 327—are questions that seem not to be settled; and it is not necessary to examine them in this case, because it is not alleged in the plea that the defendant's survey was a preliminary one. For aught that appears, the public occupation of the plaintiff's land is permanent. There is nothing in the plea raising any question upon a distinction between a temporary and a permanent use. It is admitted that the plaintiff is entitled to compensation. The contention is, whether his constitutional right of property is maintained by our belief that the public will be able and will be pleased to pay him.

The plaintiff's property has been taken by the public, under color of a compulsory purchase; and, for payment, he is recommended to the public mercy. Suppose he has a trifling claim, in contract or tort, against the most wealthy and honest man, which it is morally certain will be paid as soon as the debtor is informed of its existence: the plaintiff unnecessarily, unreasonably, and vexatiously brings a suit: the defendant pleads a moral certainty of compensation, and the plaintiff demurs: the court must sustain the demurrer. The moral certainty of mercy is not changed into a legal vindication of a constitutional right by the circumstance that the number of persons from whom mercy is expected is forty millions.

If we were at liberty to exercise an unlimited discretion, the demurrer should be sustained.  " The moment the idea is admitted into society that property is not as sacred as the laws of God, and that there is not a force of law and public justice to protect it, anarchy and tyranny commence.   If ' Thou shalt not covet ' and ' Thou shalt not steal ' were not commandments of Heaven, they must be made inviolable precepts in every society before it can be civilized or made free."   6 Works of John Adams 9.   " In a free government, almost all other rights would become utterly worthless if the government possessed an uncontrollable power over the private fortune of every citizen,   One of the fundamental objects of every good government must be the due administration of justice ; and how vain it would be to speak of such an administration, when all property is subject to the will or caprice of the legislature and the rulers."   2 Story Const., sec. 1790.